[No. 32377-0-II. Division Two. April 4, 2006.]

PREMERA ET AL., *Petitioners*, v. MIKE KREIDLER, *as Insurance Commissioner*, ET AL., *Respondents*.

---

24

26

*Robert B. Mitchell, Jr.*, and *Thomas E. Kelly, Jr.* (of *Preston Gates & Ellis, L.L.P.*) and *Charles K. Wiggins* (of *Wiggins & Masters, P.L.L.C.*), for petitioners.

*Robert M. McKenna*, Attorney General, and *Elizabeth C. Beusch*, Assistant, for respondent Insurance Commissioner.

*Nicholas B. Straley* (of *Columbia Legal Services*); *Dierk J. Meierbachtol*; *Michael F. Madden* (of *Bennett Bigelow & Leedom, P.S.*); and *Eleanor Hamburger* (of *Sirianni Youtz Meier & Spoonemore*), for intervenor respondents Welfare Rights Organizing Coalition, et al.

*Howard M. Goodfriend* on behalf of Alliance for Advancing Nonprofit Health Care, amicus curiae.

*Robert M. McKenna*, Attorney General, and *Robert J. Fallis*, Assistant, on behalf of the Attorney General's office, amicus curiae.

*Janet M. Helson* on behalf of Consumers Union of the United States, Inc., amicus curiae.

*Timothy J. Warzecha* on behalf of National Association of Insurance Commissioners, amicus curiae.

¶1 VAN DEREN, A.C.J. — Premera, Premera Blue Cross, and their affiliated companies (collectively Premera), sought to reorganize Premera's holding company system under a for-profit parent and to convert the nonprofit affiliates to for-profit companies. Washington State Insurance Commissioner Mike Kreidler (Commissioner) disapproved Premera's proposal. Premera now seeks judicial

review of the Commissioner's ruling, arguing that: (1) he improperly interpreted the health carrier holding company act (Health Carrier HCA), (2) he erred by considering Premera's proposal under the Insurer Holding Company Act (Insurer HCA), (3) he erred in applying a fair market value test to the proposed conversion, (4) he erred in concluding that the conversion will hurt subscribers and the insurance-buying public, and (5) he improperly failed to consider the benefits of Premera's proposed conversion.

¶2 We hold that the Commissioner did not err in assessing the benefits of Premera's proposal and in rejecting its conversion plan on the grounds that the plan as a whole was unfair and unreasonable to subscribers, not in the public interest, and likely to be hazardous or prejudicial to the insurance-buying public. Finding no error, we affirm the Commissioner's decision.

## FACTS[1]

¶3 Premera is an independent licensee of the Blue Cross® Blue Shield® Association (BCBSA). Based in Mountlake Terrace, Washington, Premera provides commercial health care coverage to paying subscribers in Washington and Alaska.

¶4 Premera must maintain a minimum amount of Risk Based Capital (RBC)[2] to maintain its BCBSA license and meet the requirements of the law. Premera's RBC level is among the lowest of all BCBSA licensees. In 2002, Premera's RBC level was 406 percent, not far above the 375 percent RBC threshold level for early-warning monitoring by the BCBSA. Its RBC level increased to 433 percent by the end of 2003.

---

[1] Because of the proprietary nature of much of the information involved, we granted Premera's request to allow portions of the administrative record that were placed under seal to remain under seal during this appeal. We have reviewed the entire file, sealed and unsealed, in reaching our decision. Our review makes it clear that the Commissioner did the same.

[2] RBC, expressed as a percentage, is determined by a formula that calculates the capital position of a health care service contractor or insurer relative to the various risks that it faces.

¶5 In 2002, Premera's Board of Directors unanimously determined that raising equity capital as a publicly traded company would be the best option for increasing capital. Premera informed the Commissioner and other public officials of its conversion plans on May 30, 2002. On September 17, Premera filed its "Form A" statement, the required application for approval of its proposal.

¶6 Premera's Form A proposed to create a new, completely for-profit Premera holding company (New Premera) through a series of intricate corporate liquidations and transfers. In the final step, Premera would transfer 100 percent of the initial stock of New Premera to two newly created philanthropic foundations, the Washington Foundation and the Alaska Foundation (Foundations). New Premera, the parent company, would have the right to issue new stock to meet capital needs.

¶7 The Foundations would be obligated to sell their New Premera stock according to a set schedule and would use the proceeds, estimated at between $500-700 million, to fund public health initiatives. Both New Premera and the Foundations would sell stock at the initial public offering (IPO), with New Premera deciding the number of shares to be offered. Premera proposed raising $100-150 million at the IPO with the option to raise additional capital in subsequent stock offerings.

¶8 The Commissioner assigned several members from the Office of the Insurance Commissioner (OIC) to review Premera's proposal and authorized them to retain expert consultants to assist their review and to issue reports. The Commissioner also allowed several groups to intervene. Both Premera and the intervenors engaged experts to evaluate the Form A statement and to respond to the OIC staff's review. In response to concerns the OIC experts voiced in their initial reports, Premera and the OIC staff met and resolved various issues.

¶9 On February 5, 2004, Premera filed an amended Form A statement. From May 3 through May 18, 2004, the Commissioner presided over an adjudicative hearing on

Premera's amended Form A. The Commissioner also held two rounds of public hearings in various locations around the state and accepted written public comment. The Commissioner issued his decision disapproving Premera's proposal on July 15, 2004, and Premera timely sought judicial review.[3] We accepted direct review.

## ANALYSIS

 ¶10 RCW 34.05.570 governs judicial review of an agency order. We may grant relief only if the party challenging the agency order shows that the order is invalid for one of the reasons specifically set forth in the statute. RCW 34-.05.570(1)(a), (3). Premera asserts the Commissioner's order is invalid because the order is outside the Commissioner's statutory authority or jurisdiction, is based on an erroneous interpretation and application of the law, is not supported by substantial evidence in the record, does not decide all the issues requiring resolution, and is arbitrary and capricious. RCW 34.05.570(3)(b), (d)-(f), (i).

 ¶11 We apply a substantial evidence standard to an agency's findings of fact but review de novo its conclusions of law. *Heidgerken v. Dep't of Natural Res.*, 99 Wn. App. 380, 384, 993 P.2d 934 (2000). The error of law standard "allows the reviewing court to essentially substitute its judgment for that of the administrative body, though substantial weight is accorded the agency's view of the law." *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982). "[A]lthough a commissioner cannot bind the courts, the court appropriately defers to a commissioner's interpretation of insurance statutes and rules." *Credit Gen. Ins. Co. v. Zewdu*, 82 Wn. App. 620, 627, 919 P.2d 93 (1996). Furthermore, substantial deference to agency views is appropriate when an agency determination is based heavily on factual matters, espe-

---

[3] The Commissioner entered 178 findings of fact and 17 conclusions of law in support of his 58-page decision. On appeal, Premera raises 17 assignments of error regarding a majority of the Commissioner's findings. We have organized these challenges into five major issues.

cially factual matters that are complex, technical, and close to the heart of the agency's expertise. *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 396, 932 P.2d 139 (1997).

¶12 The substantial evidence standard is "highly deferential" to the agency fact finder. *ARCO Prods. Co. v. Utils. & Transp. Comm'n*, 125 Wn.2d 805, 812, 888 P.2d 728 (1995). The evidence must be of a sufficient quantum to persuade a fair-minded person of the truth of a declared premise. *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 542-43, 869 P.2d 1045 (1994). We will not weigh the evidence or substitute our judgment regarding witness credibility for that of the agency. *Affordable Cabs, Inc. v. Employment Sec. Dep't*, 124 Wn. App. 361, 367, 101 P.3d 440 (2004). We consider findings of fact to which no error has been assigned as verities on appeal. *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 123, 615 P.2d 1279 (1980).

## I. Interpretation of the Health Carrier HCA

¶13 Premera contends that the Commissioner misinterpreted the Health Carrier HCA, chapter 48.31C RCW, and wrongly applied the standards contained in the Insurer HCA, chapter 48.31B RCW, to its conversion proposal. Premera argues that under the Health Carrier HCA, there are only two bases for disapproving the proposed conversion—the carrier's inability to satisfy registration requirements after the change in control and the likelihood that the conversion may substantially lessen competition.[4] *See* RCW 48.31C.030(5)(a). (There is no dispute that Premera can satisfy the necessary registration requirements and that conversion will not directly affect the number of competitors offering health insurance in Washington.) The Commissioner responds that the standards for disapproving the proposal are the same in both acts and that any other interpretation violates the plain meaning rule, leads to absurd results, and contravenes legislative intent. The intervenors assert that this court

---

[4] Both acts refer to mergers and acquisitions rather than conversions, but the parties agree that one or both governs Premera's proposal.

must give great deference to the Commissioner's interpretation of the Health Carrier HCA and further suggest that any ambiguity in RCW 48.31C.030 results from tabulation errors. This is an issue of first impression, as there are no decisions interpreting either act.

¶14 The Insurer HCA, covering traditional insurers, provides in pertinent part as follows:

(4)(a) The commissioner shall approve a merger or other acquisition of control referred to in subsection (1) of this section unless, after a public hearing thereon, he or she finds that:

*(i) After the change of control, the domestic insurer referred to in subsection (1) of this section would not be able to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed;*

*(ii) The effect of the merger or other acquisition of control would be substantially to lessen competition in insurance in this state or tend to create a monopoly therein. In applying the competitive standard in (a)(ii) of this subsection:*

(A) The informational requirements of RCW 48.31B.020(3)(a) and the standards of RCW 48.31B.020(4)(b) apply;

(B) The commissioner may not disapprove the merger or other acquisition if the commissioner finds that any of the situations meeting the criteria provided by RCW 48.31B.020(4)(c) exist; and

(C) The commissioner may condition the approval of the merger or other acquisition on the removal of the basis of disapproval within a specified period of time;

*(iii) The financial condition of an acquiring party is such as might jeopardize the financial stability of the insurer, or prejudice the interest of its policyholders;*

*(iv) The plans or proposals that the acquiring party has to liquidate the insurer, sell its assets, consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, are unfair and unreasonable to policyholders of the insurer and not in the public interest;*

*(v) The competence, experience, and integrity of those persons who would control the operation of the insurer are such that it*

*would not be in the interest of policyholders of the insurer and of the public to permit the merger or other acquisition of control; or*

*(vi) The acquisition is likely to be hazardous or prejudicial to the insurance-buying public.*

RCW 48.31B.015(4)(a) (emphasis added). The Insurer HCA clearly lists six independent grounds (i-vi) that the Commissioner may consider in disapproving a proposed merger or acquisition.

¶15 In contrast, the Health Carrier HCA, covering health care service contractors and health maintenance organizations,[5] provides:

(5)(a) The commissioner shall approve an acquisition of control referred to in subsection (1) of this section unless, after a public hearing, he or she finds that:

*(i) After the change of control, the domestic health carrier referred to in subsection (1) of this section would not be able to satisfy the requirements for registration as a health carrier;*

*(ii) The antitrust section of the office of the attorney general and any federal antitrust enforcement agency has chosen not to undertake a review of the proposed acquisition and the commissioner pursuant to his or her own review finds that there is substantial evidence that the effect of the acquisition may substantially lessen competition or tend to create a monopoly in the health coverage business.*

If the antitrust section of the office of the attorney general does not undertake a review of the proposed acquisition and the review is being conducted by the commissioner, then the commissioner shall seek input from the attorney general throughout the review.

If the antitrust section of the office of the attorney general undertakes a review of the proposed transaction then the attorney general shall seek input from the commissioner throughout the review. As to the commissioner, in making this determination:

---

[5] Health care service contractors are organizations that provide health care services through a provider network to enrollees who have contracted with them, while health maintenance organizations provide health care services to enrollees on a prepaid basis. 2001 FINAL LEGISLATIVE REPORT, 57th Wash. Leg., S.H.B. 1792, at 111; RCW 48.44.010(3); RCW 48.46.020(1).

(A) The informational requirements of RCW 48.31C.020(1)(a) apply;

(B) The commissioner may not disapprove the acquisition if the commissioner finds that:

(I) The acquisition will yield substantial economies of scale or economies in resource use that cannot be feasibly achieved in any other way, and the public benefits that would arise from the economies exceed the public benefits that would arise from more competition; or

(II) The acquisition will substantially increase or will prevent significant deterioration in the availability of health care coverage, and the public benefits of the increase exceed the public benefits that would arise from more competition;

(C) The commissioner may condition the approval of the acquisition on the removal of the basis of disapproval, as follows, within a specified period of time:

*(I) The financial condition of an acquiring party is such as might jeopardize the financial stability of the health carrier, or prejudice the interest of its subscribers;*

*(II) The plans or proposals that the acquiring party has to liquidate the health carrier, sell its assets, consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, are unfair and unreasonable to subscribers of the health carrier and not in the public interest;*

*(III) The competence, experience, and integrity of those persons who would control the operation of the health carrier are such that it would not be in the interest of subscribers of the health carrier and of the public to permit the merger or other acquisition of control; or*

*(IV) The acquisition is likely to be hazardous or prejudicial to the insurance-buying public.*

RCW 48.31C.030(5)(a) (emphasis added). This language shows that the same bases for disapproval that appear in the Insurer HCA also appear in the Health Carrier HCA. But in the Health Carrier HCA, the last four bases are numbered I-IV and appear under language discussing antitrust review. RCW 48.31C.030(5)(a)(ii)(C)(I)-(IV). Thus, Premera argues that RCW 48.31C.030(5)(a)(ii)(C) and its

subparts apply only to disapproval under the antitrust review factor, while the Commissioner maintains that RCW 48.31C.030(5)(a)(ii)(C)(I)-(IV) comprise four additional and independent grounds for disapproval, just as in the Insurer HCA.

■■ ¶16 If a statute's meaning is plain on its face, we must give effect to that meaning. *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 242, 88 P.3d 375 (2004). But to determine a statute's plain meaning, we may examine legislative purposes or policies appearing on the face of the statute as well as closely related statutes. *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 647, 62 P.3d 462 (2003); *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 10-12, 43 P.3d 4 (2002). Statutes related to the same subject matter or having the same purpose should be read in pari materia, or as together constituting one law. *In re Pers. Restraint of Yim*, 139 Wn.2d 581, 592, 989 P.2d 512 (1999); *see also Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 630, 869 P.2d 1034 (1994) (courts should read statutes relating to same subject as complementary).

■ ¶17 We read the two statutes at issue, RCW 48-.31B.015 and RCW 48.31C.030, in pari materia because they address related subjects and have the same purpose, i.e., the regulation of holding company acquisitions. A comparison shows that the language governing the Commissioner's review is largely similar, with only two significant differences. First, under the Insurer HCA, only the Commissioner may conduct the antitrust review. RCW 48-.31B.015(4)(a)(ii). But under the Health Carrier HCA, the Commissioner, the attorney general, or a federal antitrust agency may conduct the anticompetition inquiry. RCW 48-.31C.030(5)(a)(ii). Second, under the Insurer HCA, the antitrust review section has three subsections, including subsection (C), which has no subparts. RCW 48.31B-.015(4)(a)(ii)(A)-(C). Similar language appears in the Health Carrier HCA, except for the addition of the words "as follows" and a colon at the end of subsection (5)(a)(ii)(C), and

the retabulation of the four bases of disapproval from the Insurer HCA, RCW 48.31B.015(4)(a)(iii)-(vi), as subparts to RCW 48.31C.030(5)(a)(ii)(C).

¶18 There is no explanation on the face of RCW 48-.31C.030 for the differing tabulation of identical factors. Nor is there any statement to the effect that the Commissioner's review of a health carrier acquisition is more circumscribed than his review of an insurance company acquisition. Furthermore, the absence of any conjunction between RCW 48.31C.030(5)(a)(i) and (ii) undermines Premera's argument that these are the primary factors to consider in evaluating a health carrier acquisition. When the two statutes are read together, the placement of the four bases of disapproval in RCW 48.31C.030(5)(a)(ii)(C)(I)-(IV) is ambiguous, requiring us to resort to additional rules of statutory construction to determine the proper scope of the Commissioner's review of a health carrier acquisition.

¶19 We give effect to all of the language used in a statute, and statutory provisions must be considered in relation to each other and harmonized to ensure proper construction. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 560, 14 P.3d 133 (2000). We will "avoid readings of statutes that result in unlikely, absurd, or strained consequences." *Glaubach v. Regence Blueshield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003). An interpretation that is consistent with the spirit or purpose of the enactment is favored over a literal reading that results in unlikely or strained consequences. *State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981). Furthermore, we defer to the Commissioner's interpretation of insurance statutes and rules. *Credit Gen. Ins. Co.*, 82 Wn. App. at 627. An agency's interpretation of the statutes it administers should be upheld if it reflects a plausible construction of the statute's language and is not contrary to legislative intent. *Seatoma Convalescent Ctr. v. Dep't of Soc. & Health Servs.*, 82 Wn. App. 495, 518, 919 P.2d 602 (1996).

¶20 Premera's construction of the Health Carrier HCA is not logical and does not give effect to all of the language

used. First, the Commissioner's removal of the bases of disapproval listed under the antitrust review section in RCW 48.31C.030 will not necessarily increase competition or decrease the likelihood of a monopoly. To the contrary, improvements in management and the financial condition of the acquiring company could actually lead to an increase in market power and therefore lessen competition.

¶21 Further, Premera's interpretation of the Health Carrier HCA leads to the absurd result that the Commissioner is required to approve a proposed conversion, regardless of the harm to subscribers and the public, as long as the conversion does not substantially lessen competition or tend to create a monopoly. Under Premera's interpretation, the Commissioner would also be compelled to approve the proposal if there were no antitrust violation, even if the company's financial condition were in jeopardy and its management were incompetent or inexperienced.

¶22 Premera argues that such a result is avoided because all harms, other than anticompetitive effects, are addressed through the registration requirements in RCW 48.44.160. But the registration requirements are narrower than the bases of disapproval in the Health Carrier HCA and do not contain a similar public interest test. *See generally* RCW 48.44.160. Moreover, if compliance with the registration requirements were sufficient to remedy the bases of disapproval in the Health Carrier HCA, there would be no need for the legislature to have enacted RCW 48.31C.030(5)(a)(ii)(C)(I)-(IV). Premera's construction of the statute renders these four provisions meaningless and runs contrary to common principles of statutory interpretation. *See McGinnis v. State*, 152 Wn.2d 639, 645-46, 99 P.3d 1240 (2004) (the legislature is presumed not to include unnecessary language when it enacts legislation).

¶23 Finally, Premera's suggested construction of the Health Carrier HCA arguably contradicts the act's purpose and origin. When the legislature passed the Health Carrier HCA, the House Bill Report stated that it was similar to the holding act for traditional insurers. H.B. REP. on Substitute H.B.

1792, 57th Leg., Reg. Sess. (Wash. 2001). The legislature first enacted the language specifying the bases for disapproving a proposed insurance company acquisition in 1971. Former RCW 48.31A.050(1)(a)-(e).[6] This former statute treated monopoly considerations and prejudice to policyholders and the public interest as separate factors, as does the Model Holding Company Act on which it was based (Model Act). The Model Act, promulgated by the National Association of Insurance Commissioners (NAIC) in 1969, contains six separate bases for disapproving a proposed Form A acquisition. Nat'l Ass'n of Ins. Comm'rs, *To Draft Model Legislation Relating to Insurance Holding Companies: (D1) Subcommittee (Mtg. 25),* 1969-2 Proc. of Nat'l Ass'n of Ins. Comm'rs 737, *available at* LEXIS, 1969-2 NAIC Proc. 737, at *744.

¶24 Premera asserts that because the Health Carrier HCA is not modeled on NAIC's Model Act, the construction of the latter has little bearing on the interpretation of the former. Premera also points out that the legislature twice declined to extend the Insurer HCA to health care service contractors before enacting the Health Carrier HCA in 2001. *See* S.B. 5714, 56th Leg., Reg. Sess. (Wash. 1999); S.B. 6815, 56th Leg., Reg. Sess. (Wash. 2000). But a review of proposed health carrier conversions and acquisitions in other states shows that the factors Premera would find subsumed under the antitrust review factor are addressed as separate and equal concerns. *See Blue Cross & Blue Shield of Kan., Inc. v. Praeger,* 276 Kan. 232, 75 P.3d 226, 237 (2003) (applying five factors listed in the Kansas Insurance Companies Holding Act to deny Anthem's® request to acquire Blue Cross and Blue Shield of Kansas); *see also* Consumers Union Amicus Curiae Br. (Consumers Union Br.) at 10 n.16 (New Hampshire insurance commissioner evaluated Anthem's® proposed acquisition of Blue Cross Blue Shield of New Hampshire by addressing monopoly considerations and harm to policyholders, the public interest, and the insurance-buying public separately); Consumers Union Br. at 11 n.20 (Nevada insurance com-

---

[6] Laws of 1971, Ex. Sess., ch. 13, § 7.

missioner examined monopoly and public interest factors separately in approving the merger of Blue Cross Blue Shield of Nevada into Blue Cross Blue Shield of Colorado).[7]

¶25 Despite the differing tabulations of the disapproval provisions in the Health Carrier and Insurer HCAs, there is no evidence of legislative intent to relax the review criteria applicable to acquisitions of health care service contractors and health maintenance organizations. We hold that the Commissioner did not err when, in analyzing the proposed conversion under the Health Carrier HCA, he applied six independent grounds to evaluate Premera's proposal to become a publicly traded company.

## II. Applicability of the Insurer HCA

¶26 Premera contends that the proposed conversion is governed solely by the Health Carrier HCA. But the Commissioner, who evaluated Premera's proposal under both the Health Carrier HCA and the Insurer HCA, responds that the Insurer HCA also applies to Premera's proposed conversion.

¶27 The Insurer HCA permits the Commissioner to monitor any potential changes to a domestic insurer resulting from Form A transactions and to regulate the acquiring party's actions, plans, and proposals.[8] *See, e.g.,* RCW 48-.31B.015(2)(b), (d); RCW 48.31B.015(4)(a)(iii), (iv), (v). The Insurer HCA further permits the Commissioner to reject the entire transaction if it is likely to be harmful or prejudicial to the insurance-buying public. RCW 48.31B.015(4)(a)(vi). An attempt to acquire control of any domestic insurer triggers

---

[7] Four entities filed amicus curiae briefs in this case: Consumers Union of the United States, Inc.; the Alliance for Advancing Nonprofit Health Care; Washington State Attorney General; and the National Association of Insurance Commissioners.

[8] As stated earlier, a Form A statement is the regulatory filing that initiates review under the holding company acts of a change in control of a domestic insurer or health carrier.

the application of the Insurer HCA whether the affiliates are changed or not. RCW 48.31B.015(1).[9]

¶28 As part of its holding company system, Premera owns two domestic, for-profit insurers—LifeWise Assurance Company and LifeWise Health Plan of Arizona. The conversion plan involves acquiring control of these insurers as well as two health care service contractors— Premera Blue Cross and LifeWise Health Plan of Washington. Because Premera's holding company includes traditional insurers as well as health carriers, the Commissioner properly reviewed and disapproved Premera's proposed reorganization under both holding company acts.[10]

¶29 Premera asserts that the Commissioner made no findings with respect to the two insurers involved in the transaction, however, and improperly applied the Insurer HCA factors only to the health carriers involved. Regardless of the effect on the two insurers, the Insurer HCA appears to authorize the Commissioner to reject the entire transaction if it is hazardous or prejudicial to the insurance-buying public. RCW 48.31B.015(4)(a)(vi).

---

[9] RCW 48.31B.015(1) provides, in part:

No person may enter into an agreement to merge with or otherwise to acquire control of a domestic insurer or person controlling a domestic insurer unless, at the time the offer, request, or invitation is made or the agreement is entered into, . . . the person has filed with the commissioner and has sent to the insurer, a statement containing the information required by this section and the offer, request, invitation, agreement, or acquisition has been approved by the commissioner as prescribed in this section.

For purposes of this section a domestic insurer includes a person controlling a domestic insurer unless the person, as determined by the commissioner, is either directly or through its affiliates primarily engaged in business other than the business of insurance.

[10] Moreover, Premera's argument that the Insurer HCA does not apply is somewhat puzzling. In its petition for review, Premera asserted as follows: "As Judge Casey's Order states, two subsections of the Holding Company Acts—RCW 48.31B.015(4)(a) and RCW 48.31C.030(5)(a)—establish the criteria by which the Commissioner is required to evaluate Premera's Form A Statement." Clerk's Papers at 8. In resolving a dispute concerning the timing of the Commissioner's decision, Thurston County Superior Court Judge Paula Casey issued an order stating, among other things, that review and approval of the Form A statement is governed by the criteria in chapter 48.31B RCW and chapter 48.31C RCW. Premera refers to this order as establishing the "law of the case" without reference to its position on appeal that the Insurer HCA does not apply. Br. of Pet'rs at 2.

¶30 We hold that the Commissioner properly applied the criteria in the Insurer HCA in disapproving Premera's proposal.

## III. Evaluation of the Assets Received by the Foundations

¶31 Premera placed significant restrictions on the shares of stock the Foundations would receive following its conversion. Premera argues that the Commissioner lacked jurisdiction to evaluate those assets and that his application of a fair market value standard to that evaluation lacked legal justification.

### A. Commissioner's Jurisdiction To Evaluate Assets

¶32 To protect the public in insurance matters, "the legislature created the office of Insurance Commissioner and conferred upon that office the duty of enforcing the provisions of the code." *Ins. Co. of N. Am. v. Kueckelhan*, 70 Wn.2d 822, 831, 425 P.2d 669 (1967). To fulfill this mandate, it vested the Commissioner with broad authority. *Nat'l Fed'n of Retired Persons v. Ins. Comm'r*, 120 Wn.2d 101, 109, 838 P.2d 680 (1992). The Commissioner has authority conferred by and reasonably implied from the insurance statutes. RCW 48.02.060(1); *Nat'l Fed'n of Retired Persons*, 120 Wn.2d at 109.

¶33 The Commissioner found that Washington's nonprofit corporation law applied to Premera's reorganization plan because the proposal required the dissolution of Washington nonprofit corporations and the distribution of their assets. Citing RCW 24.03.225, .230, and RCW 24-.06.265, the Commissioner added that "[t]he law, as applicable in this case, requires that a nonprofit corporation's assets be distributed in accordance with its articles of incorporation, in accordance with a plan of distribution approved by the attorney general, or in accordance with a plan of distribution adopted by the corporation." Administrative R. (AR) at 14148. Premera argues that the Commissioner usurped the attorney general's authority in applying

the nonprofit corporation statutes and, more specifically, in analyzing the terms under which New Premera's shares of stock would be distributed to the Foundations. It maintains that philanthropic organizations are beyond the scope of the Commissioner's regulatory authority and are subject only to attorney general oversight.

¶34 RCW 24.03.225 addresses the distribution of assets of a nonprofit corporation that is voluntarily dissolving and provides in pertinent part as follows:

> (3) Assets received and held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational or similar purposes, but not held upon a condition requiring return, transfer or conveyance by reason of the dissolution, shall be transferred or conveyed to one or more domestic or foreign corporations, societies or organizations engaged in activities substantially similar to those of the dissolving corporation, pursuant to a plan of distribution adopted as provided in this chapter;

> (4) Other assets, if any, shall be distributed in accordance with the provisions of the articles of incorporation or the bylaws to the extent that the articles of incorporation or bylaws determine the distributive rights of members, or any class or classes of members, or provide for distribution to others;

> (5) Any remaining assets may be distributed to such persons, societies, organizations or domestic or foreign corporations, whether for profit or not for profit, as may be specified in a plan of distribution adopted as provided in this chapter.

¶35 RCW 24.03.230 provides that if a plan of distribution includes assets received and held by the corporation subject to limitations in RCW 24.03.225(3), notice of the proposed plan shall be submitted to the attorney general for his or her approval. Chapter 24.06 RCW, the Nonprofit Miscellaneous and Mutual Corporation Act, contains distribution provisions similar to those in RCW 24.03.225. *See* RCW 24.06.265. Although Premera insists that it is not a charitable corporation subject to RCW 24.03.225(3), the strongest authority for its jurisdictional argument is the provision in RCW 24.03.230 stating that the attorney

general must approve a plan of distribution subject to the limitations in RCW 24.03.225(3).

¶36 The Commissioner argues that he did not interfere with this grant of authority because the attorney general will still determine whether the distribution of assets complies with RCW 24.03.225 if the conversion is ultimately approved. The Commissioner maintains that he needed to be cognizant of the nonprofit corporation act's requirements, however, in assessing the proposed conversion. As he stated in finding of fact 110, "I must also consider Premera's obligations to comply with its own Articles of Incorporation and the Washington Nonprofit Corporation Act [chapter 24.03 RCW]. Otherwise Premera could undertake a transaction in violation of the law that later could be challenged or overturned, resulting in damage to the company and harm to its subscribers." AR at 14178.

¶37 The following recognition by the attorney general's office of the overlapping authority the Commissioner and attorney general possessed in reviewing Premera's proposal supports the Commissioner's finding:

> After the adjudicative hearing, the final decision should address two separate, yet interrelated, questions: (1) may Premera convert to a for-profit entity; and (2) if it may convert, is the fair value of Premera's assets protected in order to be available to be used for a lawful purpose. See generally RCW 48-.31C.030 and 050. . . . [I]f Premera is permitted to convert, the value of its assets must be distributed to one or more organizations that will fulfill a similar purpose as approved by the Attorney General. RCW 24.03.225. Although it is not within the Insurance Commissioner's role to decide the ultimate use of the proceeds from the transaction, the Commissioner should be cognizant of this legal requirement when reviewing Premera's proposal as it relates to how the value will be realized and made available for distribution.

AR at 8047.

¶38 The holding company acts expressly allow the Commissioner to disapprove an acquisition if he finds that the

plans or proposals of the acquiring party are unfair and unreasonable to subscribers and not in the public interest. RCW 48.31C.030(5)(a)(ii)(C)(II); *see also* RCW 48.31B-.015(4)(a)(iv). These provisions give the Commissioner authority to consider the acquiring party's plans for liquidating the health carrier, selling its assets, consolidating or merging it, or making any other material change in its business or corporate structure or management. The provisions clearly allow the Commissioner to consider the acquiring party's plans regarding the assets of the merged or acquired company and its affiliates.[11]

## B. Applicability of the Fair Market Value Standard

¶39 Having concluded that the Commissioner properly exercised his jurisdiction to assess the value of the assets distributed to the Foundations, we must determine whether he appropriately applied a fair market value standard to that assessment.[12] Premera compares the distribution of stock to the Foundations to gifting a piece of property subject to a mortgage or easement, and it contends that the Foundations are entitled only to the value derived from the stock with the restrictions. The Commissioner's position is that Premera's decision to convey its assets by transferring the value of the company through stock does not relieve it of the obligation to transfer what would have been the fair market value of those assets had it performed an independent appraisal or entered into an arm's-length negotiated sale.

¶40 As Premera points out, there is no conversion statute applicable to health insurers in Washington requiring the Commissioner to apply the fair market value stan-

---

[11] Furthermore, Premera's proposed findings of fact would have the Commissioner find that the proposed restrictions on the Foundations are appropriate and fully protective of the value of the stock the Foundations would hold. If the Commissioner has jurisdiction to approve the distribution of assets to the Foundations, he also has jurisdiction to reject them.

[12] Fair market value is what a willing buyer not under duress is willing to pay a willing seller also not under duress when both have adequate information. *See Coast to Coast Stores, Inc. v. Gruschus*, 100 Wn.2d 147, 163, 667 P.2d 619 (1983).

dard.[13] There is a conversion statute in Washington that expressly refers to the need to ensure that the nonprofit corporation will receive fair market value for its assets, but that statute applies only to the acquisition of nonprofit hospitals by for-profit corporations. RCW 70.45.070(5); *see also* RCW 70.45.020(3). Contrary to Premera's assertions, the Commissioner did not refer to this statute in finding the fair market value standard applicable to its conversion proposal.

¶41 Nor did the Commissioner base the fair market value standard on any conclusion regarding Premera's charitable status. Rather, the Commissioner expressly found that neither Premera nor the OIC staff undertook the legal and factual analysis necessary to determine whether Premera's assets are held as a charitable trust under Washington law. The Commissioner found that Premera is obligated to transfer the fair value of its assets to the Foundations regardless of whether a charitable trust exists.

¶42 In an amicus brief, the attorney general asserts that the record is insufficient to make that determination and asks this court to refrain from making any decision that may directly or indirectly undermine his authority or ability to protect the public interest in the proper distribution of Premera's assets. Although the record does contain some legal analysis regarding Premera's charitable status,

---

[13] By contrast, the Colorado Legislature enacted a conversion statute when Blue Cross and Blue Shield of Colorado sought to become for-profit. *Hawes v. Colo. Div. of Ins.*, 65 P.3d 1008, 1020 (Colo. 2003). That statute requires the insurance commissioner to specify a reasonable treatment of the value of the converting corporation for the citizens of Colorado. In doing so, the commissioner must ensure that the consideration to the qualifying charitable corporation equals the fair market value of the converting corporation. *Hawes*, 65 P.3d at 1020 (citing Colo. Rev. Stat. § 10-16-324(4)(e)(I)(A)-(C)). Similarly, North Carolina has a conversion statute that creates "a procedure for a medical, hospital, or dental service corporation to convert to a stock accident and health insurance company or stock life insurance company." N.C. Gen. Stat. § 58-65-131(a). For any such conversion to occur, the conversion plan "must provide a benefit to the people of North Carolina equal to one hundred percent (100%) of the fair market value of the corporation." N.C. Gen. Stat. § 58-65-131(a). In addition, Maryland has a conversion statute that requires its commissioner to ensure that "the fair value of the public or charitable assets of a nonprofit health service plan or a health maintenance organization will be distributed to the Maryland Health Care Trust." Md. Code Ann., State Gov't § 6.5-301(b)(3)(i).

as well as references to its articles of incorporation and mission, we agree with the attorney general that there is insufficient information from which to make a charitable trust assessment. *See Abbott v. Blue Cross & Blue Shield of Texas, Inc.*, 113 S.W.3d 753, 765-66 (Tex. App. 2003) (basing finding that Blue Cross/Texas is not a charity on multiple factual stipulations). We therefore decline to reach the issue of Premera's charitable status.[14]

¶43 The Commissioner's basis for the fair market value standard, independent of the law relevant to charitable trust restrictions, was as follows:

> The OIC Staff reasonably assumed, based on Premera's representations to me, the Attorney General, and in the Form A, that Premera's conversion plan was intended to convey fair market value to the Foundations. It was not until after the OIC Staff consultants issued their final reports in October 2003, in which they identified certain restrictions and provisions in the transaction documents that would affect the value of the stock to the Foundations, that Premera claimed it neither intended nor was obligated to convey fair market value. . . . Premera is obligated to transfer the fair market value of its assets to the Foundations by the terms of the Form A and by the requirements of its

---

[14] Premera also asserts that the Commissioner incorrectly assumed that the public owns its assets. The Commissioner entered no finding to that effect but did find that Premera is not owned by its directors, officers, or members and that no part of its income is distributable to those parties. In making this finding, he may have been guided by statements made by an OIC consultant, who stated that there was no ready answer to the question of who really owns Premera:

> To be sure, there are no identifiable owners analogous to those who hold that position in the case of for-profit companies. Nor can it be said, with reason, that the policyholders or insureds are PREMERA's owners, for in no sense is this company a mutual. But neither can it be said that the officers and directors are PREMERA's owners, though they surely seize for themselves one important attribute of that position: the ability to make final decisions about PREMERA's affairs and future. It may not be necessary in the evaluation of the Amended Transaction to ascertain definitively who owns PREMERA. It may suffice to assure that the people of the states of Washington and Alaska will receive the equivalent of PREMERA's fair market value. But to the extent that the proposed restrictions cause the Transaction to fall short of this standard, it is appropriate to question the basis of those restrictions.

AR at 16094-95.

Articles of Incorporation, the Washington Nonprofit Corporation Act, and the Holding Company Act.[15]

AR at 14173-74.

¶44 In May 2002, Premera sent letters to the Commissioner and the attorney general informing them that the proposed conversion would culminate in the Foundations holding "100% of the initial stock of New PREMERA, representing the entire ownership interest of New PREMERA at the conclusion of the reorganization." AR at 7769. The Form A statement made several references to Premera's commitment to convey 100 percent of its stock or 100 percent of its assets to the Foundations. In reviewing the proposed transaction, the consultants and regulators assumed that these statements embodied Premera's commitment to convey 100 percent of its fair market value. "The company clearly has told anyone who will listen that it's going to convey 100 percent of its market value." AR at 2047. A letter from Premera's counsel to the OIC staff expressly stated that Premera had agreed that it would "transfer 100 percent of its stock to the foundation shareholder, which represents the fair market value of the company upon consummation of the conversion transaction." AR at 1287.

¶45 The consultants also based the fair market value assumption on Premera's articles of incorporation, which require the company to transfer all of its assets to nonprofit entities upon dissolution. See AR at 4036 (upon winding up and dissolution, Premera's assets shall be distributed to "one or more nonprofit corporations or other nonprofit entities to be used exclusively for purposes consistent with the purposes" of Premera). "[G]iven the structure that [Premera] elected, which is dissolving their current corporation, they have to follow the articles of incorporation . . . and transfer all of their assets to nonprofit entities, and that is the fair market value." AR at 2119. One of Premera's legal experts

---

[15] For ease of reference, the Commissioner collectively referred to the Insurer and Health Carrier HCAs as "the Holding Company Act." AR at 14147.

ultimately conceded that there is no real difference between fair market value and 100 percent of an initial stock offering: "[N]ormally I would think of a person who owns 100 percent of a corporation [at] the moment it is seen public . . . whatever the fair market value is at that moment, I would think that they own that." AR at 2468. Thus, the record supports the Commissioner's conclusion that Premera's representations that it would transfer 100 percent of its stock to the Foundations meant that the Foundations would receive 100 percent of the stock's fair market value.

¶46 Support for the fair market value standard is also found in the holding company act requirements that the terms of transactions within a holding company system must be "fair and reasonable." RCW 48.31B.030(1)(a)(i); RCW 48.31C.050(1)(a). Premera asserts that this standard is inapplicable because the proposed transaction is not one within a holding company but one governed by the acquisition statutes, which do not contain the "fair and reasonable" language. *See* RCW 48.31B.015; RCW 48.31C.030. The Commissioner addressed this argument in his findings of fact:

> In reality, Premera's entire reorganization and conversion plan is an intercompany transaction. All of the assets, represented by shares of stock, are being transferred from the nonprofit Premera holding company system and being acquired by the for-profit Premera holding company system. The same board and management are controlling the terms of the transfer and the acquisition. Intercompany transactions are governed by a standard of whether the terms are fair and reasonable. This standard is necessary to prevent conflicts of interest and financial self-dealing. Premera asserts that this standard does not apply to a Form A. I believe it is a reasonable interpretation of my authority to review a Form A to consider whether the terms of the acquisition are fair and reasonable as part of my decision on whether the transaction is unfair and unreasonable to subscribers, not in the public interest, or hazardous or prejudicial to the insurance-buying public.

AR at 14178 (citations omitted).

¶47 The Commissioner also found indirect support for the fair market value standard in RCW 48.31C.030(2)(b), which requires him to review the "source, nature, and amount of the consideration used" in a health carrier acquisition. As he observed, "Reviews of transactions under the Holding Company Act typically examine the consideration paid to assure that the domestic company and, in turn, its subscribers are not being harmed or prejudiced by receiving less than fair value." AR at 14176.

¶48 The Commissioner found additional support for his application of a fair market value standard in the nonprofit corporation statutes. As one consultant opined:

> [I]t is a fundamental premise of nonprofit conversions that the fair value of the converting nonprofit entity must be transferred to a succeeding nonprofit to continue the nonprofit or public mission of the converting entity. The fair value of [the] converting nonprofit must be preserved to carry out the nonprofit mission, rather than being obtained by the owners of the new for-profit entity.

AR at 16900-01.

¶49 Finally, the Commissioner asserts on appeal that the fair market value standard simply serves as a benchmark against which to assess the fairness of the transaction with the Foundations. The former insurance commissioner of Maryland testified that it was important to ensure that fair value was being transferred to the Foundations. In approving a Blue Cross conversion in Wisconsin, an appraisal committee met to review the structure of the conversion plan, the value of the nonprofit Blue Cross organization, and the proposed uses for the proceeds of the stock sale. *ABC for Health, Inc. v. Comm'r of Ins.*, 2002 WI App 2, 250 Wis. 2d 56, 640 N.W.2d 510, 513 (2001). Similarly, the financial fairness of the transaction was evaluated when Anthem proposed to purchase Blue Cross and Blue Shield of New Hampshire. Consumers Union Br. at 10 n.16. Before New York enacted a conversion statute, the attorney general objected to a proposed conversion by Empire Blue Cross and Blue Shield (Empire) that was structurally

similar to Premera's proposed conversion. *Consumers Union of U.S., Inc. v. State*, 5 N.Y.3d 327, 840 N.E.2d 68, 73-74, 806 N.Y.S.2d 99 (2005). The attorney general found that he was " 'legally bound to protect the public interest when an organization that has enjoyed millions in state subsidies seeks to change its mission to earning profits for private owners.' " *Consumers Union*, 840 N.E.2d at 75 (quoting Statement by Att'y Gen. Eliot Spitzer). He objected to "old" Empire's continued control over the charitable foundation receiving the not-for-profit assets, questioning whether the foundation would receive fair value under such control. *Consumers Union*, 840 N.E.2d at 75 n.8.

¶50 The Commissioner's findings echo these objections and reason persuasively in favor of the fair market value standard:

> 105. Because Premera is not seeking to convert by being acquired by another insurer, there is no arms-length negotiated purchase price to establish value. Premera did not propose conveying the dollar value of its assets based on an independent appraisal—including but not limited to its investments, goodwill, contract rights, intellectual property rights, hardware, and software. Premera would understandably not convey its actual assets to the Foundations because that would put the company out of operation. Rather, Premera has elected to undergo a stand alone conversion by issuing stock and conveying that stock to the Foundations, which would realize the value of Premera's assets by monetizing the stock over time.

> 106. When an acquisition is between a buyer and a seller negotiating at arms length, the assumption is that the amount of the consideration and the structure of the financing will be fair. Indeed, each party generally obtains a fairness opinion from its bankers or consultants to that effect before consummating the transaction.

> 107. An acquisition as a result of a stand alone conversion from nonprofit to for-profit presents different issues relating to consideration under the Holding Company Act. First, there are not two parties negotiating at arms length over a purchase price. Instead, the terms of the transaction are controlled, except for my review, by the company converting. Second, the value to be received is not a specific dollar amount derived from

a sale, but is derived from the issuance of stock that will be monetized over time.

108. The only way to judge the fairness of the value produced under these circumstances is to review [the] process and terms for issuing, controlling, and monetizing the stock. Assuming that the process and terms are fair and reasonable, one can reasonably assume that the dollar amount that ultimately will be derived represents the fair market value. Further, because Premera is not owned by its management or shareholders, I must also take into account the public interest in receiving the beneficial value of the company.

AR at 14177-78.

¶51 After reviewing the terms of the stock distribution, the Commissioner found that Premera's plan to raise $100 million to $150 million in the IPO would significantly dilute the value of the stock the Foundations would receive. He also found that the restrictions and conditions placed on the Foundations' ability to control the stock rendered it impossible to find that the transaction was fair to the public from a financial point of view. The Commissioner ultimately found that Premera's plan for conversion did not convey fair market value, was not fair and reasonable to the public, and was not in the public interest.

¶52 Premera does not challenge the Commissioner's findings regarding the extent to which the conditions imposed on the Foundations would lessen the value of the stock they would receive. The issue thus becomes one of resolving conflicting expert testimony (Premera's insistence that the restrictions would enhance value versus the OIC staff's opinions that they would lessen value), rather than one of legal error. When an agency is presented with conflicting expert opinion on an issue, it is the agency's job, and not the job of the reviewing appellate body, to resolve those differences. *City of Des Moines v. Puget Sound Reg'l Council*, 108 Wn. App. 836, 852, 988 P.2d 27 (1999). Moreover, we do not weigh the evidence. *Affordable Cabs*, 124 Wn. App. at 367. Accordingly, we examine the restrictions only briefly.

¶53 As one of the OIC staff consultants observed, a majority shareholder typically has the right to:

(1) vote in its sole discretion the holder's shares on any matter as to which, under the company's articles of incorporation or bylaws, the shareholders have a right to vote, (2) elect at least some directors (without any need that such directors be approved by the rest of the board), and (3) sell all or part of the holder's stock whenever the holder decides that it is in its interest to do so (or to never sell any of that stock).

AR at 16098. The restrictions placed on the Foundations condition their exercise of such rights.

¶54 One such restriction is the mandatory stock divestiture schedule. "The Foundations are required to sell their shares of stock so that together they own less than 80% of the issued and outstanding shares of stock prior to year one, 50% prior to year three, 20% prior to year five, and 5% prior to year ten." AR at 14182. The Commissioner objected to this schedule because it deprived the Foundations of control over their shares, potentially forcing them to sell during a downturn in the market, and because it treated the two Foundations as a single stockholder, thereby forcing them to sell shares that they would not have to sell under an individual schedule. (Furthermore, the two states have yet to agree on how to allocate the shares of stock between the two Foundations.) The divestiture schedule is a BCBSA requirement.[16]

¶55 The Commissioner also found objectionable the fact that the Foundations must largely surrender their right to vote appurtenant to the stock they would receive by placing most of their voting power in a voting trust. Premera exempts from this requirement the number of voting shares equal to one share less than five percent of New Premera's voting stock. Thus, Premera would give the Foundations a single five percent free voting allotment. BCBSA has refused a request from OIC staff to allow each Foundation to receive the five percent free vote allotment. After finding

---

[16] The chief executive officers of all the "Blue" plans manage the BCBSA.

that the Foundations will have ceded significant control by complying with a divestiture schedule and voting trust, the Commissioner found that forfeiting more control through aggregated divestiture obligations and voting rights is not fair and reasonable and further reduces the value of the stock distributed to the Foundations.

¶56 Because of the voting trust, the Foundations' shares would be voted by the independent directors of the board of New Premera, except where the Foundations were specifically granted the right to vote some or all of their shares outside the trust. The Commissioner objected to the BCBSA position that a director is considered independent if the director is not employed by another company that accounts for at least 2 percent or $1 million, whichever is greater, of New Premera's consolidated gross revenues. "The result is that an employee of a major customer of New Premera, perhaps representing as much as $56 million dollars in revenue, could be considered 'independent.' " AR at 14187.

¶57 Each Foundation would have its own representative on New Premera's board. But that board could veto a Foundation's slate of three nominees, even after those nominees had been found to meet "stringent qualifications." AR at 14185. Premera would also limit Foundation board representation to five years or less than 5 percent ownership interest, whichever occurs first.

¶58 The Commissioner's objections to these and other BCBSA restrictions echo those made by consultants who reviewed the proposed conversion of Blue Cross/Blue Shield of North Carolina (BCBSNC). The consultants found that many examples of overreaching permeated the voting trust and divestiture agreement proposed for the nonprofit health foundation, with the most recent draft aggressively protecting BCBSNC's interests at the expense of the foundation that would be its principal shareholder. *See* Consumers Union Br. at 16 n.33.[17] In a memo found at the NAIC

---

[17] Note 33 on page 16 of the Consumers Union brief cites to http://www.ncdoi.com/AssociationResponse.PDF. We found the cited document at http://www.ncdoi.com/votingtrustagreementmemo.pdf.

website, the consultants urged the North Carolina insurance commissioner to carefully examine whether the proposed conversion served the public interest: "[G]iven the changing conversion landscape and ever-increasing concerns about insurance premiums, corporate governance and executive compensation, consumers are demanding greater scrutiny of conversion plans and greater protections not only for consumers but also for the foundations being created to serve the public." Mem. from LeBoeuf, Lamb, Greene & MacRae, L.L.P., and Helms Mulliss & Wicker, P.L.L.C., to Peter Kolbe, Gen. Counsel, N.C. Dep't of Ins., on Voting Trust and Divestiture Agreement Issues (Aug. 9, 2002) (Consumers Union Br., App. I, at 5).

¶59 Premera argues that the Commissioner erred in championing the Foundations' interests at its subscribers' expense. The holding company acts specify, however, that the Commissioner is to examine whether the acquiring party's proposal is unfair and unreasonable to subscribers and not in the public interest. That the Commissioner's findings regarding fair market value focus on the public interest portion of the equation does not render them erroneous. *See Wash. Indep. Tel. Ass'n v. Utils. & Transp. Comm'n*, 110 Wn. App. 498, 516, 41 P.3d 1212 (2002) (courts should defer to a regulatory agency's judgment about how best to serve the public interest), *aff'd*, 149 Wn.2d 17, 65 P.3d 319 (2003).

¶60 We hold that the Commissioner did not err in applying a fair market value standard to evaluate the assets to be transferred to the Foundations. Nor did he err in concluding that the restrictions placed on those assets would leave the for-profit New Premera largely in control and would not be in the public interest.

## IV. The Economic Impact of Conversion

¶61 The Commissioner concluded that because premiums in the individual and small group markets would likely increase in the eastern Washington counties in which Premera has market power as a consequence of the conver-

sion, Premera's proposal is unfair and unreasonable to subscribers, not in the public interest, and likely to be hazardous or prejudicial to the insurance-buying public. The Commissioner also concluded that because Premera's medical loss ratio will likely decrease as a consequence of conversion, Premera's plan is unfair and unreasonable to subscribers, not in the public interest, and likely to be hazardous or prejudicial to the insurance-buying public. Finally, the Commissioner concluded that the likelihood of an increase in premiums and a decrease in medical loss ratio, as a consequence of Premera's conversion, would be exacerbated by "the likely loss of the Section 833(b) special tax deduction, increase in Alaska premium tax, increased annual expenses of operating as a public company, and tendency for above-market compensation packages," thereby rendering the plan for conversion unfair and unreasonable to subscribers, not in the public interest, and likely to be hazardous or prejudicial to the insurance-buying public. AR at 14198.

¶62 Before we address these conclusions, we give a few definitions. Health insurance is generally grouped into three "lines" of business: individual, small group, and large group. In Washington, a "small group" has a size of 1 to 50. A "large group" is any single employer with at least 51 employees, but that category is subdivided into groups of 51-99, 100+, and "jumbo groups." There are also government accounts, which consist of jumbo groups (regulated as large groups), or government programs, where the premiums are controlled by the government entities administering the program (e.g., managed Medicaid). The term "medical loss ratio" concerns the amount that a health carrier pays out for the costs of care and related expenses. If a company has a medical loss ratio of 84 percent, it means that 84 cents of every premium dollar collected is paid out to cover costs.

¶63 Premera argues that the Commissioner's conclusions regarding its postconversion performance were governed by his adoption of an incorrect market definition. It

further asserts that regardless of the proper market assessment, the Commissioner incorrectly concluded that a for-profit Premera could raise premiums and reduce its medical loss ratio in eastern Washington.

A. Determination of the Relevant Market

¶64 The OIC and Premera economists offered differing market definitions. When an agency is presented with conflicting expert opinion on an issue, it is the agency's job to resolve that conflict. *City of Des Moines*, 108 Wn. App. at 852. Furthermore, the agency's assessment of witness credibility prevails. *Affordable Cabs*, 124 Wn. App. at 367. The Commissioner found OIC expert Keith Leffler's market definition more credible. Premera challenges the Commissioner's resolution of the conflicting expert testimony, however, and claims that the Commissioner's opinion of Premera's market power rests on a legally erroneous definition of the market in which Premera does business. The Commissioner responds that his findings regarding market power are consistent with the law and supported by substantial evidence.

¶65 The issue of market power was key to the Commissioner's determination of whether Premera could charge prices above the competitive level in selling insurance and buy coverage from physicians at below market rates after it converts to a for-profit company. As Leffler noted, the definition of the relevant market is often highly contested since a low market share implies the absence of market power or an inability to raise prices above competitive levels. "If a relatively broad and inclusive set of products is included, the measured market share will be relatively low, and as a consequence it may appear that no seller has market power." AR at 15252 n.58.

¶66 Premera's expert, Thomas McCarthy, concluded that the relevant market is all health insurance products in Washington, including self-insured products and all public or government lines of business distributed or sold by

commercial insurers.[18] McCarthy reached this conclusion because he found no significant regulatory or operational barriers for an existing insurer to offer new products, expand into new lines of business, or expand into new geographic areas of the state. With respect to eastern Washington, where Premera is currently dominant, he testified that Premera's existing competitors could quickly expand their operations and defeat any attempt by Premera to increase its premiums above competitive levels. Based on his assessment of the market, McCarthy concluded that Premera has a 28 percent market share, which indicates a lack of market power.

¶67 Leffler assessed the relevant market in a slightly different way. He concluded that only commercial insurance products should be considered and that large group, small group, and individual products in each metropolitan area should be analyzed separately. He followed guidelines offered by the Department of Justice and the Federal Trade Commission in defining the relevant market by focusing solely on possible consumer responses to a rise in price. He concluded that Premera has a 90 percent market share in the sale of individual and small group policies in the 14-county area of eastern Washington where it has the right to market under the Blue Shield name.[19] He testified that Premera has no market dominance in western Washington.

¶68 Under Leffler's analysis, however, Premera's large market share in eastern Washington did not automatically translate into a determination that Premera has market power. His analysis was sequential: after defining the current area of effective competition and finding Premera dominant in eastern Washington, he turned to the other constraints Premera faces in raising prices and the ease

---

[18] McCarthy included commercial companies that do not provide private coverage but offer only publicly-funded programs that serve government employees and the poor.

[19] These counties are Adams, Benton, Chelan, Douglas, Ferry, Franklin, Grant, Kittitas, Lincoln, Okanagan, Pend Oreille, Spokane, Stevens, and Whitman.

with which other insurers may enter the market. Leffler concluded that there are some impediments to entry and expansion in the 14-county area in which Premera has market dominance:

> Most important is consumers' and employers' inertia in switching health care providers and insurers. Employers indicate that they are very reluctant to switch insurance plans if their employees do not retain full access to the doctors that they are accustomed to seeing. This implies that, to compete on an equal basis, an entrant must duplicate the provider network of any dominant seller. This can be quite costly to accomplish in the short run. In addition to buyer and employer inertia, an employer that switches health insurers faces administrative costs from dealing with employee concerns from a change and dealing with the different procedures of new insurers. The Blue Cross brand name and the legal constraint on Regence Blue Shield from directly competing under the Blue Shield name in most of Eastern Washington also provide some protection to Premera from entry and expansion by competitors.

AR at 15237 (footnote omitted). Leffler ultimately concluded that Premera has market power in the individual and small group markets in the eastern Washington counties in which it has market dominance.

¶69 Premera now contends that Leffler erred in defining the relevant market in terms of demand considerations alone and that his segmentation of the market produced artificially high market shares for its individual and small group markets in certain eastern Washington counties. It maintains that supply substitutes must be included in the original market definition and cites as support the analysis in *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), in which Leffler was an expert witness. Premera argues that the Ninth Circuit Court of Appeals rejected Leffler's definition of the relevant market in *Rebel Oil* and emphasized that defining a market on the basis of demand considerations alone is erroneous because a reasonable market definition must also consider "[s]upply elasticity," which measures the responsiveness of producers to price increases. *See Rebel Oil*, 51 F.3d at 1436.

¶70 Defining the market to include consideration of supply substitutes has support elsewhere. One treatise states that a relevant market is the smallest market for which the elasticity of demand and supply is sufficiently low, such that a firm with 100 percent of that market could profitably reduce output and increase its price substantially. HERBERT HOVENKAMP, ECONOMICS AND FEDERAL ANTITRUST LAW, § 3.2, at 59 (1985). "[I]t is essential to measure both elasticity of demand *and* elasticity of supply when calculating a relevant market." HOVENKAMP, *supra*, § 3.2, at 60. The author further explains, however, that market analysis accounts for high elasticity in two different ways:

> *First,* it can include in the market definition those firms easily able to switch to the defendant's market in response to the principal firm's price increase. *Second,* it can define the market more narrowly, but conclude that entry barriers are low. If supply elasticities are high under either measure, the defendant lacks substantial market power.

HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY: THE LAWS OF COMPETITION AND ITS PRACTICE, § 3.5c, at 112 (2d ed. 1999). The second approach appears to resemble that taken by Leffler.

 ¶71 He relied on the market definition contained in the Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines*. These guidelines were promulgated in 1968 to aid the department in deciding whether to prosecute antitrust violations. *United States v. Kinder*, 64 F.3d 757, 771 (2d Cir. 1995) (Leval, C.J., dissenting). Although the *Merger Guidelines* do not bind the judiciary in determining whether to sanction a corporate merger or acquisition for anticompetitive effect, courts commonly cite them "as a benchmark of legality." *Kinder*, 64 F.3d at 771 (Leval, C.J., dissenting) (citing Steven A. Newborn & Virginia L. Snider, *The Growing Judicial Acceptance of the Merger Guidelines*, 60 ANTITRUST L. J. 849, 851 (1992)).

¶72 The *Merger Guidelines* are part of this record and state that market definition focuses solely on demand substitution factors—that is, possible consumer responses

to an increase in price. "Supply substitution factors—i.e., possible production responses—are considered elsewhere in the Guidelines in the identification of firms that participate in the relevant market and the analysis of entry." AR at 4146. Thus, a relevant market is described by a product or group of products and a geographic area.[20] Once defined, a relevant market must be <u>measured</u> in terms of its participants and concentration or in terms of possible supply substitutes. Participants include firms currently producing or selling the market's products in its geographic area and firms that could enter the market rapidly without incurring significant entry and exit costs. This is the sequential approach that Leffler used to analyze whether Premera has market power.

¶73 A federal district court recognized the split in opinion regarding the consideration of supply substitutes in its assessment of the ready to eat (RTE) cereal industry. *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 361 (S.D.N.Y. 1995). It noted: "Whether assessed as part of market definition (as is suggested by decisional law) or as a separate exercise in identifying market participants (as is directed by the Merger Guidelines), evidence of supply substitutability supports a conclusion that the relevant market is all RTE cereals." *New York*, 926 F. Supp. at 361.

¶74 Thus, Premera's claim that Leffler committed legal error in applying the *Merger Guidelines* is not entirely accurate. But even if McCarthy's market definition were preferable, Leffler testified that of the four examples McCarthy offered of successful market entry by Premera competitors into Premera's eastern Washington markets, one was an existing carrier's acquisition of another existing carrier, another entered and failed, another had very few enrollees in the small group and individual market in the 14 counties, and the last was not an insurer. Further, of the

---

[20] "A geographic market is the area in which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Fed. Trade Comm'n v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999).

six examples McCarthy offered of successful expansion, one was the same failure he cited as evidence of successful entry and the others were carriers that have been offering the same line of business as Premera, so they are not examples of successful carrier expansion into new lines in this area.[21]

¶75 Premera cites a Seventh Circuit Court of Appeals decision to support McCarthy's conclusion regarding the absence of entry barriers in Washington. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1332 (7th Cir. 1986). In *Ball Memorial*, the court found entry barriers in Indiana's health insurance market to be extremely low: "The market in health care financing is competitive . . . not only because customers can switch readily but also because new suppliers can enter quickly and existing ones can expand their sales quickly. More than 1000 firms are licensed to sell health insurance in Indiana, and more than 500 sell this insurance currently." 784 F.2d at 1332. The Tenth Circuit Court of Appeals found a different situation in Kansas and rejected Blue Cross's argument that entry barriers in the relevant market were nonexistent. *Reazin v. Blue Cross & Blue Shield of Kan. Inc.*, 899 F.2d 951, 971 (10th Cir. 1990). While only capital and licensing were necessary to initially enter the health care financing market in Kansas, no other entrant remotely approached Blue Cross's domination of that market. *Reazin*, 899 F.2d at 971. The *Reazin* court respectfully disagreed with the observation in *Ball Memorial* that entry barriers in the health care financing market are always low anywhere in the country. *Reazin*, 899 F.2d at 972 n.32.[22]

---

[21] Premera argues that the success of Asuris in eastern Washington refutes Leffler's conclusions regarding its market power in that region. (Asuris is the name under which Regence operates in most of eastern Washington.) Leffler admitted that Asuris is an example of a competitor that offers some constraint on Premera's exercise of market power, but he still concluded that Premera continues to dominate some markets in these 14 counties, and both he and another economist raised questions concerning Asuris's continued success. *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366-67 (9th Cir. 1988) (a declining market share does not foreclose a finding of market power).

[22] The court also appeared to support Leffler's approach to defining the market, as it stated that market share is the initial determination, after which a court

¶76 The record shows that the health insurance market in Washington compares more closely to that in *Reazin* than in *Ball Memorial*. Premera Blue Cross is one of the largest health insurers in the state, if not the largest.[23]

> The most significant competitors are Regence Blue Shield of Washington, the second largest health plan, which competes directly in the western counties of the state and has a smaller presence with its non-Blue Asuris brand in the eastern part of the state, and Group Health Cooperative, the third largest, an HMO that operates in the Seattle metropolitan area and in Spokane, the largest city in the eastern part of the state.

> The top three health plans cover 75% of the insured enrollees in the state, but the market share of the plans differs by line of business and geography. Premera and Regence Blue Shield are the leading insurers in individual and small group business, and have similar statewide market share. Large group business is more evenly split but also attracts national and regional health plans. In Western Washington, Premera is second to Regence; in Eastern Washington Premera is the dominant insurer as a result of business it acquired in the merger with Medical Services Corporation, a Blue Shield plan, in 1998.

AR at 15315. Another study adds that many small insurance companies that participated in the Washington market have withdrawn, gone out of business, or merged. The state had 30 full-service plans in 1997, but this number dropped to 20 by 2002. The remaining companies are pursuing a "niche strategy" regarding their participation in various markets. AR at 8261.

¶77 Premera, Regence, and Group Health have established themselves as the three dominant insurers in the private side of the market, with a strong presence in the small and large group employer markets. Premera, Regence, and Aetna dominate the self-funded administrative services-

---

should consider factors such as the number and strength of the defendant's competitors and the difficulty or ease of entry into the market by new competitors. *Reazin*, 899 F.2d at 967 n.23.

[23] The Commissioner found that as of 2002, Premera and Regence had roughly equal shares totaling 56 percent of insured business.

only market,[24] while Premera, Regence, and Group Health account for most of the individual market. The "Blues" and many other commercial carriers have tended to pull back in many publicly funded markets. Both Premera and Group Health have pulled out of the Washington Medicaid program.

¶78 There is much anecdotal evidence in the record to support the conclusion that Premera enjoys market dominance in eastern Washington in selling individual and small group health insurance and in purchasing health care services from physicians. An article appearing in a 2000 Washington State Medical Association (WSMA) publication stated that "Premera has over 70 percent of the local private market" in Spokane and "is dictating terms to physicians." AR at 398. A Premera vice president admitted that his company has the largest provider network in the state. One OIC expert described Premera as having a "very large presence" in eastern Washington, and a Spokane internist who is also president of the WSMA stated that Premera's share of his clinic's business is five times larger than the next biggest share. AR at 1670.

¶79 Premera's objections notwithstanding, both market definition and market power are essentially questions of fact. *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988). Courts grant great deference to agency views that are based on complex factual matters within the agency's area of expertise. The definition of the market in which Premera does business is arguably such a matter, and Premera has not shown that the Commissioner erred in relying on the OIC expert's analysis regarding the relevant market and Premera's market power.

B. Effect of Conversion on Premiums and Reimbursement Rates

¶80 Despite Premera's insistence that Leffler erred in concluding that it has market power, he and McCarthy

---

[24] The Commissioner explained that large group contracts, such as Premera's contract with Microsoft, are often administrative services contracts. Under these contracts, the "insurance risk" remains with the employer, who pays an administrative fee to Premera to administer the employer's health plan. AR at 14157.

reached similar conclusions about Premera's ability to increase premiums and lower reimbursement rates. McCarthy concluded that Premera could not raise premiums or lower reimbursements because of the competition it faces. Leffler found that Premera could not exercise its market power in selling insurance due to its own practices and insurance regulations, and he also found that Premera had already largely exercised its market power in purchasing provider services in eastern Washington, as its reimbursement rates are lower there than in western Washington. Leffler also concluded, however, that:

> there are likely some unexploited opportunities to raise premiums and lower reimbursements. . . . When Premera is converted to for-profit it is expected that the market pressures to fully exploit pricing opportunities will be greater than under its current not-for-profit organization. Hence it is likely that some premiums in some areas will likely increase and some reimbursements to some providers will decrease.

AR at 15279.

¶81 Martin Staehlin, of PricewaterhouseCoopers (PwC), and Lichiou Lee, OIC's chief actuary, testified about the possibility of the "unexploited opportunities" to which Leffler referred. They both testified that the regulatory requirement of revenue neutrality, which means that an increase of profitability in one geographic area must be balanced by a corresponding decrease of profitability elsewhere, could be circumvented by creating a new insurance product that would not be subject to the revenue neutrality requirement.

> Mr. Staehlin agreed with Ms. Lee that one way to sidestep the revenue neutrality requirement is to alter a product's characteristics slightly and treat it as a new product, thereby negating the prior product's claims experience and allowing a carrier to use "actuarial judgment" to fill the gap. Mr. Staehlin's testimony demonstrates that the actual complexity of rate filings and a carrier's ability to make alterations such as ones he and Ms. Lee suggested would enable Premera to achieve its

target margins by raising premiums or taking other anti-competitive actions in those areas where it has market power.

AR at 14171; *see also* AR at 7653 (another PwC consultant found that "Premera has the regulatory ability to increase premiums and market ability to maintain its current membership at rates higher than those it currently charges in some markets"). Premera dismisses the "Staehlin scheme" as completely unrealistic. The Commissioner's assessment of Staehlin's testimony would appear to be within his area of expertise, however, and we defer to his acceptance of a means whereby Premera could increase premiums.

¶82 The PwC economic impact analysis did not assess the regulatory controls Premera faces, but it applied Leffler's findings of Premera's market power in concluding that Premera would have to increase premiums or decrease administrative costs or provider reimbursements to meet target operating margins following a conversion. Premera criticizes the Commissioner's reliance on the PwC analysis because it did not consider the regulatory climate in which Premera operates but simply assumed that premiums could be increased.

¶83 As the Kansas Supreme Court stated, however, "the Commissioner is not required to wait until likely future harm to the public appears before locking the barn door; [he] may do so now as a preventative." *Praeger*, 75 P.3d at 245. The Kansas court also noted that making projections for insurance companies is not an exact science. *Praeger*, 75 P.3d at 252. Premera does not question the PwC report's underlying premise that as a public company, it will be required to produce continuous and significantly increased growth in such key areas as net income and operating margins. In addition, other experts testified that Premera could circumvent revenue neutrality requirements, thereby raising premiums in certain regions and product lines if necessary.

¶84 In an attempt to gain approval of its conversion plan, Premera agreed to continue using the rate development methods currently in place for individual and small

group markets. But the assurances will last for only two years, which PwC found an insufficient period of time. The Commissioner also found that the assurances would have little actual effect:

> Because the rates in the individual market are not approved by the OIC and are essentially unregulated, the assurances will not constrain individual rates. In addition . . . there is also a considerable amount of maneuverability that Premera will retain in rating products in the small group market. By simply adjusting benefits in any given group product, the assurances become ineffective.

AR at 14171.

¶85 Premera also challenges the Commissioner's conclusions regarding the possibility of reducing its medical loss ratio. Leffler testified that Premera was already reimbursing physicians in eastern Washington at a lower rate than its competitors and that it has largely exploited its market power on the buying side. He added, however, that while Premera's market power with respect to provider reimbursements may be fully exploited under the current regional reimbursement and contracting procedures, such procedures could be changed by Premera to more fully exploit its market power.[25]

¶86 The record supports the Commissioner's concerns about the risk of decreased spending on medical care by a for-profit Premera. There was considerable testimony to the effect that for-profit converted carriers tend to spend less on medical care as a percentage of their premiums. An article included as an attachment to McCarthy's prefiled testimony found that conversion tends to lower medical loss ratios. As the article explains,

> [T]here is no reason to believe that a profit-maximizing company will be content with the profits gained solely by reducing administrative expenses. Instead, industry analysts maintained that for-profit insurers can be expected to improve

---

[25] In contrast to premiums, provider reimbursements need not be filed with the OIC.

profits in every way possible. These other methods are included in the insurer's medical loss ratio, which is the portion of premium revenues spent on paying medical claims. In general, the loss ratios of for-profit [Blue Cross] plans are about five to ten percentage points lower than those of nonprofit [Blue Cross] plans.

AR at 3066 (footnote omitted) (Mark A. Hall & Christopher J. Conover, *The Impact of Blue Cross Conversions on Accessibility, Affordability, and the Public Interest*, 8 THE MILBANK Q. (2003)).

¶87 Another expert recognized that conversion will not alleviate the pressures already in place to lower provider reimbursements in eastern Washington. "Providers in that geographic area have limited choice regarding participating in Premera networks. These circumstances will be unchanged following a conversion, while pressure to meet financial performance goals will be heightened, putting added pressure on provider relations." AR at 15446. A WSMA representative was concerned that conversion would exacerbate the "huge imbalance of power" between Premera and physicians, providing physicians with even less leverage and less ability to negotiate contracts. AR at 2150. Furthermore, to the extent that regulatory constraints inhibit premium increases following conversion, shareholder expectations could increase pressure on Premera to reduce payments to providers or simply withdraw from unprofitable markets entirely, either of which could reduce access for state residents. As the former Maryland insurance commissioner stated, "Reduced reimbursements can lead to network adequacy problems, and can serve to strain the ability of provider[s] to provide quality care to all patients." AR at 8171.

¶88 Premera also disagrees with the Commissioner's conclusions that the likelihood of an increase in premiums and a decrease in medical loss ratio will be exacerbated by the likely loss of a federal tax deduction, an increase in Alaska taxes, increased annual expenses, and Premera's tendency to provide above-market compensation packages.

¶89 The tax deduction at issue is the Internal Revenue Code (I.R.C.) § 833(b) deduction. After finding that the underwriting practices of Blue Cross plans were similar to those of commercial insurers, Congress revoked the "Blues' " tax exemption in 1986. *Consumers Union*, 840 N.E.2d at 72-73. Under I.R.C. § 833(b), however, the "Blues" retain certain tax advantages by calculating taxable income in a manner different from that used by commercial insurers. *Consumers Union*, 840 N.E.2d at 73 n.4. The ability to retain this deduction depends on Premera not experiencing a "material change in its structure," which a PwC tax expert opined conversion would be. AR at 1533. He saw a "considerable degree of risk" that a converted Premera would lose the section 833(b) deduction and testified that if the deduction were lost, Premera's tax rate would go up by approximately 15 percent, with a corresponding decrease in its "bottom line." AR at 1535-36.

¶90 Premera relies on a "short form" tax opinion from its experts which states that it is "more likely than not" that a conversion would not cause it to experience a material change in structure. AR at 1534. A "short form" opinion provides the opinion of the advisor but not a well-reasoned analysis in support of that opinion. A PwC report stated that a "more likely than not" opinion is viewed as a more than 50 percent chance of sustaining a tax position, but a relatively low level of assurance for important tax issues. AR at 15575. The PwC analyst cited informal Internal Revenue Service statements to the effect that a conversion such as Premera's would constitute a material change in structure and reasoned that the strain on earnings created by the loss of the deduction could cause a diminution in value of the enterprise. The PwC report concluded that "the risk of Premera experiencing a 'material change in structure,' and attendant loss of tax benefits, is significant and must be considered by the OIC in evaluating the potential negative financial impact to the company, policyholders, and public as a result of the Conversion Transaction." AR at 15575.

¶91 As earlier stated, the Commissioner also concluded that Premera's potential for increasing premiums and reducing provider reimbursements after conversion would be exacerbated by its tendency to provide above-market compensation to its executives. The record demonstrates that Premera's current levels of executive compensation are well above those of other Blues organizations as well as its two major competitors in Washington and that its executive compensation levels will remain above market after conversion. Here again, Premera has provided assurances to reduce fears that its executives will receive unreasonable financial gains as a result of its conversion. As the Commissioner noted, however, the assurances will serve to moderate compensation only during their two-year duration.

¶92 The Commissioner also voiced concern about the $3.5 million in additional annual expenses that Premera would incur by operating as a public company and by the increased Alaska premium tax it would have to pay. Premera responds that the increased expenses would be immaterial and asserts that any increase in Alaska taxes would not affect its Washington subscribers. These additional expenses would need to be absorbed, however, and could add to the pressure that would be exerted on Premera to increase profits following conversion. As *The Milbank Quarterly* article cited earlier observes, "It almost goes without saying that conversion from nonprofit to for-profit status increases the pressure to generate more profits. . . . [F]or-profit insurers have a 'legal, ethical, and fiduciary duty to maximize profits for shareholders.' " AR at 3061. Premera's board is now responsible to its members and to the community it serves but, following conversion to a for-profit company, the board's principal duty would be to its shareholders. As a for-profit plan, Premera would face the tension of maximizing its stock value for its shareholders and containing premium rates and provider payments.

¶93 The evidence persuades us that the Commissioner reasonably assessed several categories of increased costs in determining whether conversion would serve Premera's

subscribers and the insurance-buying public. We hold that the Commissioner did not err in assessing the economic impact of conversion and that substantial evidence supports the findings leading to the conclusion that conversion would be harmful to Premera's subscribers and the insurance-buying public and not in the public interest.

## V. Benefits of Premera's Conversion

¶94 Premera asserts that the Commissioner erred in failing to consider the benefits that increased capital would create for the company as well as the public benefits of the Washington Foundation.

¶95 The Commissioner found that Premera's reasons for converting are (1) to increase RBC, (2) to improve products and services, (3) to support subscriber growth, (4) to preserve autonomy, (5) to operate on a level playing field with other health carriers, and (6) to improve management retention. Thus, Premera's plans for the equity capital it will raise are fairly general, contrary to the usual practice of companies planning a conversion. The Commissioner found that "[r]ather than having specifically-identified capital requirements dictate the need for a conversion and the amount of capital that should be raised, Premera has first decided how much it plans to raise at the IPO and will decide at a later date how that capital will be specifically used." AR at 14156. The Commissioner also found that conversions of other nonprofit providers to for-profit entities did not raise the amount of capital that Premera plans to raise.

¶96 Although Premera protests that it provided ample plans for the capital it would raise, the record supports the Commissioner's finding that these plans are general at best. One Premera executive stated that the reasons for conversion are "to provide capital to enhance the company's capital position, position the company for growth in membership, and provide funds for investment in infrastructure and products." AR at 3521. He and another Premera wit-

ness admitted that the company does not have a specific list of how the additional capital would be spent. Furthermore, the Premera witnesses insisted that the company is financially sound and can meet its objectives without converting.

¶97 An OIC expert opined that raising too much capital without specific uses for that capital could have a potentially dilutive effect. He testified that rather than state specifically how the money raised from the IPO would be used, Premera has said that it would be put initially into 4 percent bonds. In addition, a report on the proposed conversion stated that Premera does not need the amount of capital it proposes to raise in the IPO. Significantly, Premera does not assign error to the following finding of fact: "Premera believes that conversion would permit it to achieve 'strategic flexibility' by obtaining access to additional capital from the equity markets. However, Premera has planned for and can successfully pursue its objectives of improved services and products, growth, and increased operational efficiencies without converting to a for-profit." AR at 14161. *The Milbank Quarterly* states that the experts interviewed did not think that improved access to equity capital was a compelling reason for financially healthy Blue Cross plans to convert:

> One national expert thought that [Blue Cross] plans with a strong market share should have no trouble raising the capital they need for business innovations, even though they are nonprofit. Another expert noted that in recent years, most for-profit health insurers chose to raise capital through debt rather than equity, and another expert observed that in the last few years, for-profit insurers' primary need for major amounts of capital was for new acquisitions, not for improving operations.

AR at 3066.

¶98 Premera complains that the Commissioner misstated the evidence on the available capital-raising alternatives. The Commissioner's finding does not describe any evidence, but simply observes that "[a]lternative methods for increasing RBC are debt financing and surplus notes.

Premera could also generate RBC level increases through income and investments, which is how it was able to increase its RBC by 27 percentage points from 2002 to 2003, even as it spent heavily on conversion efforts." AR at 14155.

¶99 Premera also challenges whether the Commissioner adequately assessed the consequences of its proposed conversion. One consequence the Commissioner considered was the ease with which other companies could acquire a for-profit Premera. The Commissioner traced the history of other conversions and found that with the exception of WellChoice of New York, other "Blue" plans that converted to for-profits have been acquired by either Wellpoint or Anthem, which will soon merge, thus leaving only two for-profit "Blue" plans. As one witness testified, it is the exception rather than the rule for a converted carrier to remain independent. WSMA representatives expressed concern about an out-of-state acquisition of Premera and the further distancing of health care decisions. As the WSMA president testified, "In my experience, out-of-state carriers do not understand, or do not wish to understand, the health needs of our local communities." AR at 8587. Although Premera stated that it has no plans to be acquired, it would not rule out the possibility of acquisition, and the Commissioner found that the acquisition of a for-profit company by another for-profit would be easier than the nonprofit conversion process.

¶100 Regarding the potential benefit to the state resulting from the creation of the Washington Foundation, the Commissioner found simply that "[t]he failure of Premera to transfer fair market value would undermine any possible mitigation that the creation of a Washington Foundation could have on the hazardous and prejudicial effects of the conversion on subscribers, the insurance-buying public, and the public in general." AR at 14188-89. Contrary to Premera's current argument, this finding does not mean that the Commissioner did not consider possible mitigating effects. Rather, he found that they did not outweigh Premera's failure to transfer fair market value to the Foundations.

¶101 The record supports this finding. The president and chief executive officer of the California Healthcare Association and California Association of Hospitals and Health Systems testified that the money that charitable foundations pay out is miniscule compared to the hundreds of millions of dollars coming from those who pay health premiums. He also testified that the conversion of California's Blue Cross has directly contributed to the dysfunctional nature of that state's health care system, adding that the benefits from the philanthropic foundations created have not begun to offset the negative consequences of conversion. Another OIC expert agreed that the benefits the Foundations would create would pale in comparison to what goes on in the health care marketplace.

¶102 A report from an expert offered by the intervenors responded to Premera's contention that the Foundations would result in a "burst of health philanthropy" to address issues of the uninsured, health status of minorities, community mental health funding, and the effects of rising costs on access in rural communities. AR at 16914. The report concluded that the potential philanthropic benefits of the proposed Foundations would be either short-lived (if the level of charitable spending were high) or small (if charitable spending were sustained) relative to the significant problems of the health care systems in Washington and Alaska, which the proposed conversion would likely exacerbate.

¶103 The report further noted that Premera had suggested that the combined assets of the two Foundations might be $500-600 million, and it reasoned that the Foundations could maximize their impact in the short run by making grants and carrying out programs that spent the corpus in 5 to 10 years. Benefits of $50-100 million per year would therefore accrue but would end when the funds ran out, "whereas any negative effects of the conversion will continue on into the future." AR at 16915. Or the Foundations could choose to spend the typical amount of 5 percent of their endowments annually, thus engaging in

charitable activities of about $25-30 million per year. To determine how much influence such an expenditure might have, the report turned to figures projecting the total annual personal health care spending for 2004 to be $25.5 billion in Washington and $2.8 billion in Alaska. Thus, the outflow from the Foundations of $30 million would be equal to about 0.11 percent of the total health care spending in the two states.

¶104 The report found it even more pertinent to weigh the potential benefit of $30 million or even $100 million in charitable activities against the potential negative effects of conversion. The report explained how increases in premiums could increase the numbers of uninsured in each state, and it opined that if the Foundations simply purchased health insurance for the newly uninsured, there would be potentially insufficient amounts[26] left for other expenditures.

¶105 Finally, the report addressed the restrictions placed on the Foundations' activities, first noting that the proposed use of Foundation funds seemed quite beneficial. It then observed, however, that Premera's plan appeared to prohibit the use by the Foundations of the conversion assets for any activity that "likely would result" in negative effects on any health insurer. AR at 16917.

> Thus, even if the foundation boards' [sic] determined that, for example, tighter insurance regulations were essential to fulfilling the foundations' mission to improve access, it would be prohibited from using the conversion assets to work for such changes. Since much attention has, and will be, placed on the health insurance market as a key factor in, if not cause of, many access barriers, this clause seems quite limiting concerning the potential benefits for state residents.[27]

---

[26] Actual figure redacted from public report.

[27] The Foundations' proposed articles of incorporation prevent them from engaging in lobbying that may result in material adverse changes in health insurer operations, and Premera's plan of distribution prevents the Foundations from engaging in activities that would result in material adverse changes to health insurer operations. Other witnesses were concerned about these provisions.

AR at 16917. The report concluded that the Foundations' potential activities did not offset the conversion's negative effects. *See also* AR at 16905 (A report for the Washington hospital associations concluded that "because of significant uncertainty over whether an IPO will in fact deliver the fair value of the company to a foundation, it is not clear or certain to what extent, if any, the Foundation could offset the negative impact associated with the transaction.").

¶106 The Alaska intervenors recommended rejection of Premera's conversion proposal, partly because of the allocation issues that remained: "[H]ow can the Commissioner have any peace of mind about whether this conversion is in the public interest when it has no idea how much the Washington foundation will actually receive and whether the amount that it receives will be enough to mitigate against the very really [sic] negative impacts attendant with this conversion[?]" AR at 2574.

¶107 *The Milbank Quarterly* also addresses the foundation benefits issue and observes that the revenue stream from the conversion foundations may not directly offset all the affordability and accessibility consequences of conversion. "On a pro rata basis, foundation funding usually amounts to only a few tens of dollars per [Blue Cross] subscriber each year." AR at 3073. The conversion foundations are not viewed as permanent sources of support for significant numbers of people who cannot afford or obtain health insurance or health care. Rather, the bulk of Blue Cross conversion foundation funding has gone to research, public policy advocacy, and education. "Although these are worthy activities, their impact on alleviating the plight of those affected by higher premiums . . . is uncertain." AR at 3073. The article concludes that "[t]o the extent that foundations pursue goals other than directly subsidizing the accessibility and affordability of health care, it is difficult to weigh a foundation's benefits against a conversion's accessibility and affordability detriments." AR at 3074.

¶108 We hold that the Commissioner did not err in assessing the benefits of Premera's proposal and in rejecting its conversion plan on the grounds that the plan as a whole was unfair and unreasonable to subscribers, not in the public interest, and likely to be hazardous or prejudicial to the insurance-buying public.

¶109 We affirm the Commissioner's disapproval of Premera's plan to reorganize and convert from nonprofit to for-profit status.

HOUGHTON and ARMSTRONG, JJ., concur.

After modification, further reconsideration denied June 14, 2006.