# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| RODNEY R. PARR and LINDA J. PARR, husband and wife,<br><br>               Appellants,<br><br>   v.<br><br>HASELWOOD IMPORTS, INC., a Washington corporation; WILER MANAGEMENT TRUST; HASELWOOD FAMILY TRUST,<br><br>               Respondents. | No. 53640-4-II<br><br><br><br><br>PUBLISHED OPINION |

MELNICK, J. — Rodney and Linda Parr appeal the trial court's summary judgment dismissal of their breach of contract and accounting claims against Wiler Management Trust and Haselwood Family Trust (hereafter collectively Haselwood).

The Parrs sold all of their shares in their Volkswagen dealership to Haselwood. The Parrs argue that pursuant to the purchase and sales agreement (PSA), money the dealership received and money it is owed from the settlement of a class action lawsuit against Volkswagen of America (Volkswagen) belong to the Parrs. The Parrs also ask us to reverse the trial court's grant of attorney fees and costs to Haselwood. We conclude that the settlement payments belong to Haselwood pursuant to the PSA, and we affirm.

FACTS

On August 5, 2015, the Parrs entered into a PSA with Haselwood to sell all of their shares in a Volkswagen dealership. The sale allowed the dealership to operate continuously without interruption through the closing date. The purchase price consisted of both the tangible assets of the business and the goodwill associated with the business. Because the dealership continued to operate throughout the sale and closing period, the parties agreed to adjust the sale price to account for income and expenses that existed prior to closing but would not come to or be paid by the business until after closing. The PSA contained a provision to govern the allocation of the income and expense:

> 10.7.2 The Parties recognize and agree that at Closing there will be items of income and expense which will not have been received by and/or posted in the accounting records of the Dealership[]. . . . Examples of these may be contracts in transit, dealer rebates, factory holdbacks, accounts receivable for work performed, sales made, etc., prior to the date of Closing. Examples of expense items are such things as rebates due customers, refunds due customers, customer deposits, purchases on account received, but not yet paid, etc. It is the intention of the Parties that the sale price of the Dealership[] shall be increased by all such items of income and decreased by all such items of expense. Accordingly, as soon as practical after Closing, Peterson Sullivan, LLP, Certified Public Accountants, Seattle, Washington, shall determine the necessary adjustments to the purchase price of the Dealership[] as a result of these items of income and expense. The amount so determined shall be paid by the Party owing a net positive amount to the other by bank wire transfer within five (5) days of the determination of the net amount due.

Clerk's Papers (CP) at 115.

Under the PSA, accounts receivable was defined as: "all amounts due the Dealership[] . . . on account of services rendered, parts or accessories sold or delivered, used or new vehicles sold or delivered, receivables due from the Franchisor, and all other accrued monetary claims or money due the Dealership[] . . . as of the Closing Date with regard to the Business." CP at 89.

The closing memorandum and agreement contained a section entitled "Lawsuits" that listed three pending lawsuits in which the Parrs were a party. The section concluded that the Parrs "agree . . . to pursue each of these matters. . . . At the conclusion of each of these lawsuits the resulting amounts receivable and amounts payable shall be subject to the post-closing provision below." CP at 82.

In September 2015, the United States Environmental Protection Agency issued a notice of violation to Volkswagen that alleged the company installed devices in certain cars to evade the emission control system. The Parrs learned about the notice of violation when it first become public, around September 18, 2015. However, the violation "was not an issue" when the parties were negotiating the PSA. CP at 65. The sale of the dealership closed on December 10, 2015. The purchase price did not change because of the violation.

In April 2016, three Volkswagen dealerships filed a class action lawsuit on behalf of all Volkswagen dealerships in the United States.[1] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1058 (N.D. Cal. 2017). The complaint alleged that the dealerships lost significant value in the loss of goodwill and profits from the unsellable cars as a result of emissions scandal. Am. Compl. at 1, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 02672-CRB (JSC) (N.D. Cal. Sept. 30, 2016) (hereafter *Volkswagen Litigation*), https://www.hbsslaw.com/sites/default/files/case-downloads/vw-dealers/amendedandconsolidatedclassactioncomplaint-redacted-57f43b511c20b.pdf. The

---

[1] The Case was originally filed in the Northern District of Illinois then was transferred by the United States Judicial Panel on Multidistrict Litigation to the United States District Court for the Northern District of California.

complaint also alleged that Volkswagen had, independent from the emissions issues, engaged in "illegal pricing and allocation schemes, and coercion to use Volkswagen Credit." Am. Compl. at 1, *Volkswagen Litig.*

In October 2016, the federal court granted preliminary approval of a settlement agreement and approved notice to the proposed class.[2] The settlement agreement defined the class as "all authorized Volkswagen dealers in the United States who, on September 18, 2015, operated a Volkswagen branded dealership pursuant to a valid Volkswagen Dealer Agreement." *In re Volkswagen*, 229 F. Supp. 3d at 1058. The settlement entitled each class member to payments "intended as compensation to Dealer Settlement Class Members for alleged diminution in value of the capital and goodwill in their franchises resulting from the TDI Matter and other alleged action or inaction by Volkswagen to the extent such action or inaction is covered in the Released Claims." Final Settlement Agreement at 12-13, *Volkswagen Litig.* (N.D. Cal. Sept. 30, 2016), https://www.hbsslaw.com/sites/default/files/case-downloads/vw-dealers/final-settlement-agreement.pdf.

---

[2] The final settlement agreement was not approved until January 2016, but dealerships, including Haselwood, could submit their claim prior to that time. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 6091259 (N.D. Cal. Oct. 18, 2016).

In exchange for receiving the funds, the settlement required class members to release any claims related to the emissions scandal as well as claims related to illegal pricing and coercion.[3] The final settlement agreement discussed the claims and alleged damage resulting from the emissions issue. It mentioned the claims not related to the emissions scandal once but did not otherwise discuss them. Final Settlement Agreement at 20, *Volkswagen Litig.*

Haselwood submitted the required forms to Volkswagen to claim the settlement amount. Haselwood subsequently received a payment from the settlement. Other payments would be forthcoming.

In February 2017, the Parrs submitted forms to Volkswagen to claim the settlement payments. Volkswagen denied the request for three reasons. First, the Parrs did not have the authority to execute a release on behalf of the dealership that they no longer owned. Next, "[b]ecause [Volkswagen] settled with and agreed to pay Volkswagen dealerships in operation as of September 18, 2015, rather than the owners of Volkswagen dealerships in operation as of September 18, 2015, you are not a class member and have no claims to any of the settlement funds

---

[3]  (2) all claims related in any way to [Volkswagen Group of America, Inc.'s] previously announced goals or objectives for [United States] sales volume growth[,] . . . (3) all claims for monetary damages arising before the Effective Date of the Franchise Dealer Class Agreement that relate in any way to allocation complaints or irregularities[,] . . . (4) all claims for monetary damages arising before the Effective Date of the Franchise Dealer Class Agreement that relate in any way to the method upon which [Volkswagen Group of America, Inc.] measures the sales and service performance of its Volkswagen-branded franchise dealers or sets the sales and service objectives for its Volkswagen-branded franchise dealers[,] . . . and (5) all discrimination or coercion claims arising before the Effective Date of the Franchise Dealer Class Agreement related in any way to the sale, incentivization or use of [VCI Loan Services, LLC] wholesale and retail financing products (collectively, the "Released Claims").

CP at 203.

owed to the authorized dealership." CP at 515. Lastly, Volkswagen informed the Parrs that it already "fulfilled its current obligations under the Agreement . . . because it has already made the settlement payments due to the dealership entity, not the current or former owners of the dealership." CP at 515.

Soon thereafter, the Parrs requested that Haselwood send them the settlement amount in accordance with the PSA. Haselwood refused.

In September, the Parrs filed a complaint, alleging that Haselwood breached the PSA by refusing to allocate the Volkswagen settlement payments to the Parrs as required by section 10.2.7 of the PSA. The Parrs also requested a full accounting of any money received by Haselwood in payment for the settlement, and any payment received as a result of the emission problems with Volkswagen brand vehicles.

Haselwood moved for summary judgment. In support of its motion, Haselwood submitted an opinion by Drew Voth, a financial expert. Voth opined that generally accepted accounting principles (GAAP) supported excluding the Volkswagen settlement payments in the post-closing adjustments. According to Voth, the Volkswagen settlement payments were a type of contingent income known under GAAP as a "gain contingency." A gain contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain to an entity that will ultimately be resolved when one or more future events occur or fail to occur." CP at 368.

In support of the motion, Haselwood also submitted a copy of a valuation analysis of the dealership from August to December 2015. The analysis concluded that the dealership's goodwill was "minimally impacted" by the emissions scandal between August and December 2015, the closing period. CP at 251. Haselwood also submitted an industry publication analyzing auto

dealership markets. It showed that, at the end of 2016, Volkswagen had a goodwill factor near the bottom of its industry class.

Haselwood also provided excerpts of Parr's deposition. Parr admitted that he did not suffer any damage from the emissions scandal, because when people purchased cars from the dealership under his ownership, they did so without knowing that the cars contained devices that evaded the emission control system.

In opposition to the motion for summary judgment, the Parrs submitted a declaration by Chris Russel, the managing partner of the Parrs' accounting firm. Russel stated that "Peterson Sullivan, LLP was never asked, nor did [it] ever undertake to determine which of the parties to this lawsuit was entitled to any funds from Volkswagen or as a result of the class action lawsuit involving the Volkswagen diesel emissions scandal." CP at 452. The Parrs also included the declaration of Michael Massey, an accountant. CP at 457. He agreed with Voth that "GAAP requires that the [Volkswagen] Settlement Payment should not be recorded on the books of the Company until December 19, 2016, when the dealership actually began receiving payments." CP at 457. However, 10.7.2 requires that items of income not yet received by the closing date be part of the price adjustment. Therefore, he asserted that "[GAAP] only determines when the payment is to be recorded on the books of the company. It is Section 10.7.2 of the PSA that determines which of the parties is entitled to the money." CP at 457-58.

The court granted Haselwood's motion for summary judgment and dismissed the claim. It ordered that Haselwood, as the prevailing party, was entitled to reasonable attorneys' fees and costs. The Parrs appeal.

ANALYSIS

I.      BREACH OF CONTRACT

The Parrs argue that there are genuine issues of material fact regarding whether Haselwood breached the PSA. All of their arguments involve interpretation of the PSA. First, they contend that the settlement proceeds are properly classified as income belonging to the Parrs under the PSA. They also assert that because the original lawsuit brought claims related to conduct arising prior to closing, the settlement proceeds constitute income under the PSA.[4] Finally, the Parrs argue that the conduct of the parties shows that they intended the settlement payments to be classified as income. The Parrs also ask us to reverse the trial court's award of attorney fees and costs. We disagree with the Parrs and conclude that the settlement payments do not constitute income owed to the Parrs under the PSA.

We review a trial court's decision to grant summary judgment de novo, performing the same inquiry as the trial court. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d

---

[4] The release agreement required class members to release any claims related to the emissions scandal as well as claims related to illegal pricing and coercion. However, the Parrs' arguments before the court below did not mention the claims unrelated to the emissions issues. In the response to Haselwood's motion for summary judgment, the Parrs only mentioned the settlement amount in relation to "defective emission devices on some of the vehicles the dealerships had purchased as of September 18, 2015." CP at 373. Additionally, at the hearing before the court on the summary judgment motion, the Parrs did not mention the claims unrelated to the emissions violation. The court stated that the purpose of the settlement was to compensate for the impact of the emissions violations, including the decrease in good will of Volkswagen dealerships.

RAP 9.12 provides that "[o]n review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." It is for this reason that "[i]ssues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal." *Cano–Garcia v. King County*, 168 Wn. App. 223, 248, 277 P.3d 34 (2012). We decline to consider the Parrs' argument that the settlement proceeds constitute income under the PSA because the original lawsuit brought claims related to conduct arising prior to closing and unrelated to the emissions violation.

860 (2013). Summary judgment is appropriate where there are "'no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.'" *Puget Sound Energy, Inc.*, 176 Wn.2d at 922 (quoting *Qwest Corp. v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007)).

The primary goal in interpreting a contract is to ascertain the intent of the parties, which we determine by focusing on the objective manifestation of the parties in the written agreement rather than the unexpressed subjective intent of either party. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Where the contract language is clear, the intent is ascertained from the language of the contract as a question of law. *In re Estates of Wahl*, 99 Wn.2d 828, 831, 664 P.2d 1250 (1983).

Accordingly, "a court considers only what the parties wrote; giving words in a contract their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates a contrary intent." *4105 1st Ave. S. Invs., LLC v. Green Depot WA Pac. Coast, LLC*, 179 Wn. App. 777, 784, 321 P.3d 254 (2014). Even without ambiguity, however, "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent." *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990).

Although the Parrs state that there are genuine issues of material fact remaining, they argue that the terms of the PSA dictate that the settlement payments are income. Interpretation of the language of the contract is a question of law. *Wahl*, 99 Wn.2d at 831. At issue is whether the settlement payments from Volkswagen qualify as income under section 10.7.2 of the PSA.

The PSA does not define income but instead gives examples: "contracts in transit, dealer rebates, factory holdbacks, accounts receivable for work performed, sales made, etc., prior to the

date of Closing." CP at 115. The only conceivable categories the settlement could fall under are accounts receivable or "etc."

The PSA defines accounts receivable as: "all amounts due the Dealership[] . . . on account of services rendered, parts or accessories sold or delivered, used or new vehicles sold or delivered, receivables due from the Franchisor, and all other accrued monetary claims or money due to the Dealership[] . . . as of the Closing Date with regard to the Business." CP at 89. The sale of the dealership closed on December 10, 2015.

In October 2016, the federal court granted preliminary approval of a settlement agreement and approved notice to the proposed class. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 6091259 (N.D. Cal. Oct. 18, 2016). The federal court approved the final settlement agreement in January 2017. *In re Volkswagen*, 229 F. Supp. 3d 1052. Both of these events occurred after the sale of the dealership closed.

Even if a settlement agreement could be considered income under the PSA, the Volkswagen settlement does not because it does not fall within the definition of accounts receivable. The payments did not and could not possibly have accrued or been due prior to the closing date.[5] Further, a settlement resulting from a then non-existent lawsuit is entirely unlike the "work performed" or "sales made" that precede the word "etc." which in any case is also

---

[5] The term "accrue" has different meanings. In a legal sense, for example, it means when a claim begins for statute of limitations purposes. A cause of action accrues, generally speaking, when a party has the right to apply to a court for relief. *Malnar v. Carlson*, 128 Wn.2d 521, 529, 910 P.2d 455 (1996). According to Investopedia, in a financial sense, "[t]he term 'accrue,' when related to finance, is synonymous with an 'accrual' under the accounting method outlined by Generally Accepted Accounting Principles (GAAP) and International Financial Reporting Standards (IFRS). An accrual is an "accounting adjustment used to track and record revenues that have been earned but not received, or expenses that have been incurred but not paid." Something is "accrued" financially when it is earned. *Accrue*, INVESTOPEDIA, https://www.investopedia.com/terms/a/accrue.asp (last updated July 30, 2020).

cabined by "prior to the date of Closing." CP at 115. Under the principle of ejusdem generis, a general term used in conjunction with specific terms will be deemed to include only those things that are in the same class or nature as the specific ones. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 151, 3 P.3d 741 (2000) (discussing the maxim as a rule of statutory interpretation); *Kitsap County v. Allstate Ins. Co*., 136 Wn.2d 567, 590-91, 964 P.2d 1173 (1998) (discussing the maxim as a principle of contract interpretation). Unlike the enumerated items of income identified in section 10.7.2 or identified in the definition for accounts receivable, the Volkswagen settlement proceeds were neither identifiable nor quantifiable on the date of closing.

In the closing memorandum and agreement, the parties accounted for money payable to the Parrs arising from lawsuits that were already pending at the time of closing. That section provides that "[a]t the conclusion of each of [the three listed] lawsuits, the resulting amounts receivable and amounts payable shall be subject to the post-closing provision." CP at 82. The parties demonstrate that they knew how to make provisions for proceeds from lawsuits. Had they contemplated a settlement arising from an anticipated lawsuit, they would have included language that provided for it, but they did not.

The Parrs assert that the settlement payments meet the definition of accounts receivable because the payments are receivables due from the Franchisor "'as of September 18, 2015.'" Br. of Appellant at 20 (quoting CP at 515). The payments were due on that date, according to Parr, because the lawsuit defined the class as all authorized Volkswagen dealers who operated a dealership on September 18, 2015, and Parr owned the dealership on that date.

This argument fails for at least two reasons. First, the defined class does not change the fact that the payments from the settlement agreement were not due to the dealership prior to closing. The settlement occurred well after the closing date. Second, the final settlement

agreement makes clear that the payments were "intended as compensation for alleged diminution in value of franchise dealers' capital and goodwill." Final Settlement Agreement at 4, *Volkswagen Litig.* The alleged diminution in value did not occur on September 18, 2015 or even shortly thereafter. Parr admitted that he did not suffer any injury because of the emissions scandal. The valuation of the dealership shows that there was no harm done to the dealership between September and December 2015. The Parrs were not the owners when Volkswagen dealerships felt the effects of the violation. Therefore, the compensation for those effects cannot be "due" to the Parrs regardless of the date in the class definition.

Finally, the Parrs argue that the conduct of the parties, specifically the fact that after the closing date the parties made adjustments to the purchase price under 10.7.2, shows that they intended for the settlement to be classified as income under that provision and thus, a genuine issue of material fact remains. However, because the language of the PSA is clear, we do not need to consider the conduct of the parties to interpret it. *Wahl*, 99 Wn.2d at 831.

We conclude that the trial court did not err in granting summary judgment to Haselwood because the Volkswagen settlement payments are not owed to the Parrs under the terms of the PSA. Accordingly, the superior court's grant of attorney fees and costs to Haselwood as the prevailing party was also proper.[6]

---

[6] The PSA provides "[i]n any action brought to enforce any provision of this document, the prevailing party shall be entitled to receive from the other party all reasonable costs and reasonable attorneys' fees incurred by the prevailing party." CP at 121

## II.    ACCOUNTING

The Parrs assert that Haselwood refused to inform them of the exact amount of the settlement funds Haselwood received; therefore, the Parrs are entitled to an accounting because the exact amount of income properly allocated to the Parrs is complicated.  We disagree.

"'[A] complaint for an accounting must show by specific averments that there is a fiduciary relation existing between the parties, or that the account is so complicated that it cannot conveniently be taken in an action at law.  And it must allege that the plaintiff has demanded an accounting from the defendant, and the latter's refusal to render it.'"  *Corbin v. Madison,* 12 Wn. App. 318, 327, 529 P.2d 1145 (1974) (internal quotation marks omitted) (quoting *State v. Taylor*, 58 Wn.2d 252, 262, 362 P.2d 247 (1961)).

Because the Parrs are not entitled to the settlement payments under the PSA, they have no interest in the allegedly complicated account and are thus not entitled to an accounting of the settlement funds.

We affirm.

_____
Melnick, J.

We concur:

_____
Worswick, P.J.

_____
Glasgow, J.

13