# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| CRAIG R. JOLLEY, DMD, PLLC, a Washington Professional Limited Liability Company, | No. 60782-4-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON OFFICE OF INSURANCE COMMISSIONER (Mike Kreidler, Commissioner), | UNPUBLISHED OPINION |
| Respondent. | |

MAXA, P.J. – Craig R. Jolley, DMD, PLLC (Jolley) appeals the final order on summary judgment in favor of the Office of the Insurance Commissioner (OIC), which was issued by the OIC's reviewing officer. The reviewing officer affirmed the OIC's determination that Jolley was acting as an insurer without authority.

Jolley operates a dental office and offered a membership contract to its uninsured patients. Jolley agreed to provide up to two dental examinations and cleanings per year and needed x-rays plus one emergency examination per year if needed to members in exchange for an initial fee and monthly dues. The OIC determined that Jolley's membership program caused

him to be acting as an unauthorized insurer or an unauthorized health care services contractor (HCSC) and issued a cease and desist order that included a $20,000 fine, back taxes, and penalties.

RCW 48.01.040 states, "Insurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." The cases also provide that to constitute insurance, a contract must shift and distribute risk. Jolley argues that the membership contract did not constitute insurance under RCW 48.01.040 because it did not involve (a) indemnity or payment of a specified amount, (b) determinable contingencies, or (c) risk shifting and risk distribution. Instead, the contract merely involved the provision of certain preventative dental services and payment for those services over time.

We conclude that Jolley's membership contract constituted engaging in insurance under RCW 48.01.040 only in part. Providing for dental examinations/cleanings do not constitute engaging in insurance under the facts of this case, but providing for emergency examinations and needed x-rays does. In the absence of direct authority, we determine that OIC can penalize Jolley only for the portion of its membership contract that constitutes insurance. We decline to address the OIC's alternative argument that Jolley was operating as an unauthorized HCSC.

Accordingly, we affirm in part and reverse in part the reviewing officer's final order and remand for further proceedings. On remand, the reviewing officer or administrative law judge can consider the OIC's argument that Jolley was operating as an unauthorized HCSC. The OIC should modify the cease and desist order consistent with this opinion and with the ruling on its HCSC argument and reconsider the imposition of the $20,000 fine, back taxes, and penalties.

FACTS

Craig R. Jolley, DMD, PLLC is a limited liability company. Dr. Jolley is the owner of that company. And Dr. Jolley provides the dental services rendered by the PLLC.

*Jolley's Membership Club*

Between 2013 and 2021, Jolley offered a membership contract to its uninsured patients. Members who entered into the contract paid a $50 initiation fee and monthly dues in exchange for services offered in the contract. Jolley's materials referred to the program as the "Craig R. Jolley, DMD Subscription Membership Club." Clerk's Papers (CP) at 1315. The contract is between Jolley and each patient, and it is not transferable to another dentist.

Jolley offered three membership levels. First, the adult membership provided two cleanings per year, one to two doctor exams per year, needed x-rays, and one emergency exam per year if needed, for a monthly payment of $42. Second, the periodontal disease membership provided three to four cleanings per year, one to two doctor exams per year, needed x-rays, and one emergency exam per year if needed, for a monthly payment of $67. Third, the child membership provided two cleanings per year, one to two doctor exams per year, needed x-rays, fluoride treatment, and one emergency exam per year if needed. The membership contract also stated that members enrolled in any plan would receive a "[c]ourtesy discount of 15% off all other treatments (some exclusions may apply)." CP at 1315-16.

Members were only entitled to receive the services in the contract if their membership dues were up to date.

Members could cancel their membership at any time. If someone paid the initiation fee and did not schedule an appointment within 30 days, the initiation fee was refunded.

If a member received all of the services promised in the contract, they would pay less in dues than an uninsured non-member who received all of the services would pay out of pocket.

When members signed up for the membership club, they were prompted to acknowledge that "I understand that I am not prepaying for future services or for access to discounted services, but agreeing to make regular monthly subscription payments instead of paying at the time of each service." CP at 1319. The membership contract materials also asserted that the "[s]ubscription membership club payments are not insurance but a payment arrangement . . . for services rendered." CP at 1321.

When club members received dental services under the membership contract, Jolley tracked the transactions in a patient ledger. The ledger listed the description of services rendered and the standard charges for those services. A column entitled "[p]ayment" showed a "[m]embership [c]lub" credit in the amount of the charges. *See* CP at 1344. For example, for one patient there were several services rendered, and the charges totaled $489. Under the payment column there was a membership club credit for the same amount.

Club members paid their monthly dues through a company called Illumitrac. Illumitrac would combine the dues, deduct a fee, and make a monthly deposit into Jolley's bank account. Jolley deposited revenues from patients, insurers and other sources into the same account. Jolley used the bank account to which these funds were deposited to pay its "taxes, employees, vendors, and other obligations." CP at 1308. Craig Jolley, as the owner, was entitled to any PLLC profits.

Some patients paid their initiation fee, received services of greater value than that fee, but then cancelled their membership without paying additional dues.

Over the eight years when Jolley offered this membership contract to patients, Jolley collected $210,051 from 162 consumers. While operating its membership club, Jolley never was authorized by the OIC to act as an insurer or an HCSC.

*Administrative Proceeding*

In September 2020, the OIC received a tip regarding Jolley's membership club. The OIC advised Jolley that its membership program might constitute an unauthorized insurance product. Jolley replied that the monthly subscription fee was payment for services already provided and "very similar to the direct patient-provider model . . . where uninsured patients can choose to pay a monthly subscription fee for access to preventative care." CP at 406.

The OIC opened an investigation into Jolley's membership club. The OIC determined that Jolley was acting as an unauthorized insurer. The OIC issued a cease and desist order prohibiting Jolley from engaging in the unauthorized business of insurance or acting as an unregistered HCSC. The order imposed a $20,000 fine plus back taxes and penalties.

Jolley initiated an administrative proceeding seeking reversal of the cease and desist order. The matter was heard before an administrative law judge (ALJ).[1]

Both parties filed summary judgment motions. The OIC argued that the membership club indemnified members by providing dental services free of charge if members needed them. The OIC also argued that an individual patient's need for services was a determinable

---

[1] Jolley originally argued that the OIC engaged in improper rulemaking in stating that dentists could not rely on chapter 48.150 RCW, which allows certain medical providers to engage in a direct patient-provider practice that does not constitute insurance. The ALJ declined to consider this argument, and Jolley subsequently filed its rule challenge in Thurston County Superior Court. The superior court dismissed the case for failure to exhaust administrative remedies, and this court reversed that dismissal in *Jolley v. Office of Insurance Commissioner*, No. 59466-8-II (Wash. Ct. App. May 28, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2059466-8-II%20Unpublished%20Opinion. The rule challenge is not at issue in this appeal.

contingency on which these payments were made. In addition, the OIC asserted that Jolley was operating as an unauthorized HCSC because it accepted prepayment for services. Jolley argued that the contract was not insurance because the membership contract did not involve determinable contingency, risk-shifting, or risk-distribution. Jolley did not address the OIC's argument that it was operating as an unauthorized HCSC.

The ALJ issued an initial order on summary judgment in favor of the OIC, finding that Jolley acted as an insurer. The initial order discussed that Jolley indemnified members "[b]y collecting membership fees from members and applying those fees to the members' accounts in an amount commensurate with the value of services received." CP at 38-39. The ruling also identified the emergency exams as a determinable contingency. The ALJ did not address the argument that Jolley was acting as an unauthorized HCSC.

Jolley filed a petition for review with the Office of Administrative Hearings. Jolley argued the ALJ applied the summary judgment standard incorrectly and repeated its argument that the contract did not satisfy the elements required to be an insurance contract.

The reviewing officer issued a final order, affirming the initial order and adopting the ALJ's finding and conclusions. The reviewing officer also entered additional conclusions of law:

> 5.4 The membership club contract is a contract for insurance for all the reasons cited in the Initial Order. The record contains multiple examples of Appellant agreeing "to indemnify another or pay a specified amount upon determinable contingencies." RCW 48.01.040.

> 5.5 . . . Whether individual patients would need [an emergency exam or x-rays] in a given time period are determinable contingencies. One contingency rests on whether an emergency that necessitates an emergency exam occurs, the other on the opinion of the patient's dentist regarding the need for x-rays. The members pay Appellant monthly dues, which Appellant retains, and in return Appellant provides those services, free of additional charge, should those contingencies arise. In other words, Appellant indemnifies the members for the value of those services. Appellant's interrogatory responses contain at least six examples of members who

joined the club, received services, paid only membership dues, then left the club without owing Appellant further payment as the result of the indemnification.

5.6 The amount of exams and cleanings themselves are also determinable contingencies. The membership gives ranges for the number of cleanings and exams that a patient may receive. All membership tiers provide "Doctor exams (1-2 per year)." In addition to these, the "Perio Membership" provides "Perio maintenance cleanings (3-4 per year)." Ex 6 p.16. The amount of these services that a particular club member may require is a determinable contingency for which Appellant agreed to indemnify the member.

5.7 The contingent nature of the number of exams, cleanings, x-rays, and emergency examinations create a risk of loss (the cost of those services) that is shifted to Appellant via the membership agreement and distributed amongst the members via their monthly dues. These are the risk-shifting and risk-distributing mechanisms that, while not required by the test of the statute, are nonetheless contemplated by *Armed Citizens' Legal Def Network v. Wash. State Ins. Comm'r*, 28 Wn. App. 2d 64 (2003).

CP at 24-25.

The reviewing officer affirmed the cease and desist order and the $20,000 fine, back taxes, and penalties.

Jolley appealed the reviewing officer's final order to the King County Superior Court, which then transferred the appeal to this court under RCW 34.05.518(1)(b)(i).

ANALYSIS

A.     LEGAL BACKGROUND

The OIC is responsible for administering and enforcing the insurance code. RCW 48.02.060(1), (2). This includes investigating and preventing the unauthorized provision of insurance. RCW 48.02.060(3)(a)-(b); RCW 48.15.020(1).

"Insurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." RCW 48.01.040. An insurer is "every person engaged in the business of making contracts of insurance." RCW 48.01.050. Nobody may act as an insurer without authorization from the OIC. RCW 48.15.020(1). If an insurer solicits or

transacts insurance business in the state without authorization, the OIC may issue civil penalties and impose a cease and desist order. RCW 48.02.080(3)(a); RCW 48.15.023(5)(a)(i)-(ii).

In addition, entities in the health care industry may seek a certificate of authority as an HCSC. RCW 48.44.010(9); RCW 48.44.015(1). HCSCs are:

> any corporation, cooperative group, or association, which is sponsored by or otherwise intimately connected with a provider . . . who or which not otherwise being engaged in in the insurance business, accepts prepayment for health care services from or for the benefit of persons or groups of persons as consideration for providing such persons with any health care services.

RCW 48.44.010(9). Nobody may act as an HCSC without registering with the OIC. RCW 48.44.015(1).

Direct patient-provider practices offer customers an alternative payment model for "primary care services." RCW 48.150.005. Direct practice providers enter into a written agreement directly with their direct patient, "whereby the direct practice charges a direct fee as consideration for . . . providing primary care services to the individual direct patient." RCW 48.150.010(1). RCW 48.150.060 states. "Direct practices . . . who comply with this chapter are not insurers under RCW 48.01.050 . . . [or] health care service contractors under chapter 48.44 RCW." The OIC apparently has determined that only medical doctors can qualify as a direct practice provider. Whether Jolley qualifies as a direct practice provider is not at issue in this appeal.

B.    ENGAGING IN INSURANCE

Jolley argues that the reviewing officer's final order for summary judgment was an error of law because its membership contract does not constitute insurance. We agree in part and disagree in part.

1.   Standard of Review

We review OIC actions under the Administrative Procedures Act (APA), chapter 34.05 RCW. *Armed Citizens' Legal Def. Network v. Off. of the Ins. Comm'r*, 28 Wn. App. 2d 64, 73, 534 P.3d 439 (2023), *review denied*, 2 Wn.3d 1015 (2024). Under the APA, we may grant relief from an agency's order based on the reasons listed in RCW 34.05.570(3), including that the order is based on an erroneous interpretation or application of the law. RCW 34.05.570(3)(d). The party challenging the agency's decision has the burden of demonstrating the invalidity of that decision. RCW 34.05.570(1)(a).

When an administrative decision is decided on summary judgment, we overlay the APA and summary judgment standards of review. *Waste Mgmt. of Wash.*, *Inc. v. Wash. Utils. and Transp. Comm'n*, 24 Wn. App. 2d 338, 344, 519 P.3d 963 (2022). We review the decision de novo and construes the facts and reasonable inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment can be determined as a matter of law if the material facts are not in dispute. *Id*.

We review alleged errors of law de novo. *Greenfield v. Dep't of Lab. and Indus.*, 27 Wn. App. 2d 28, 44, 531 P.3d 290 (2023). We are not bound by an agency's interpretation of a statute. *Armed Citizens*, 28 Wn. App. 2d at 74. But we give substantial weight to an agency's interpretation of the statutes it administers. *Id*. This deference applies to the OIC's interpretation of the insurance code. *Premera v. Kreidler*, 133 Wn. App. 23, 37, 66, 131 P.3d 930 (2006).

2.   Legal Principles

When deciding whether the insurance code applies to a particular contract, we are " 'guided by the substance or effect of the transaction' " rather than any particular label. *Pope Res. LP v. Certain Underwriters at Lloyd's, London*, 19 Wn. App. 2d 113, 142, 494 P.3d 1076

(2021) (quoting *Ten Bridges, LLC v. Guandai*, 15 Wn. App. 2d 223, 237, 474 P.3d 1060 (2020)). An agreement may constitute an insurance contract even if it does not resemble a traditional insurance policy. *Armed Citizens*, 28 Wn. App. 2d at 74; *see also McCarty v. King County Med. Serv. Corp.*, 26 Wn.2d 660, 684, 175 P.2d 653 (1946) ("No one can change the nature of insurance business by declaring in the contract that it is not insurance.").

RCW 48.01.040 defines "insurance" as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." Although not explicitly required by the text of RCW 48.01.040, courts also have determined that a contract must be a " 'risk-shifting and risk-distributing device' " to be insurance. *Armed Citizens*, 28 Wn. App. 2d at 74 (quoting *Pope Res.*, 19 Wn. App. 2d at 142). " 'A contract may be a risk-shifting device, but to be <u>a contract of insurance</u>, which is a risk-distributing device, it must possess both features, and unless it does[,] it is not <u>a contract of insurance</u> whatever be its name or its form.' " *Pope Res.*, 19 Wn. App. 2d at 141-42 (alteration and emphasis in original) (quoting *In re Estate of Smiley*, 35 Wn.2d 863, 867, 216 P.2d 212 (1950)).

Therefore, to constitute "insurance" for purposes of RCW 48.01.040, an agreement must (1) be a contract, (2) that undertakes to indemnify another or pay a specified amount, (3) on determinable contingencies, and (4) is both a risk shifting and risk distributing device. *See Armed Citizens*, 28 Wn. App. 2d at 74.

Because the insurance code does not define "indemnity," we refer to the ordinary meaning contained in standard dictionaries. *Id.* at 77. " 'Indemnify' means 'to secure or protect against hurt or loss or damage,' 'to exempt from incurred penalties or liabilities' and 'to make compensation to for incurred hurt or loss or damage.' " *Id*. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1147 (8th ed. 2002)). The term " 'refers to the compensation

necessary to reimburse the insured's loss.' " *Armed Citizens*, 28 Wn. App. 2d at 77 (quoting 1 J. Thomas & F. Mootz, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 105[4] (2023)). "Where an insured 'suffers a loss, the insurer pays proceeds, a benefit, to the insured in an amount that offsets the loss.' " *Armed Citizens*, 28 Wn. App. 2d at 77 (quoting NEW APPLEMAN at § 105[4]).

Indemnity typically involves payment of money, but it also can be provided by rendering some act of value to the insured. *In re Knight's Estate*, 31 Wn.2d 813, 816, 199 P.2d 89 (1948) ("Insurance . . . may be defined as an agreement by which one person, for a consideration, *promises to pay money or its equivalent, or to perform some act of value, to or for the benefit of another person*, upon the . . . injury of someone or something as the result of specified perils" (emphasis added)), *overruled on other grounds by In re Leuthold's Est*ate, 52 Wn.2d 299, 324 P.2d 1103 (1958); 1 COUCH ON INSURANCE § 1:8 (3d ed. 2025) ("A contract does not cease to be one of insurance merely because it requires compensation in something other than money, whether the other form of payment is the equivalent of money or merely the rendering of some act of value to the insured.").

The insurance code also does not define "determinable contingencies." Determinable means something that is " 'capable of being determined.' " *Armed Citizens*, 28 Wn. App. 2d at 79 (quoting WEBSTER'S at 616.) "Contingency" is defined as " 'the condition that something may or may not occur,' 'the condition of being subject to chance,' 'an event or condition occurring by chance and without intent, viewed as possible or eventually probable, or depending on uncertain occurrences or coincidences.' " *Armed Citizens*, 28 Wn. App. 2d at 79 (quoting WEBSTER'S at 493). "The contingency is defined at the time of the contract, not at the time of the loss." *Armed Citizens*, 28 Wn. App. 2d at 80.

The contingency requirement implements the insurance concept of fortuity, under which an insurer must pay only for a loss that is accidental rather than a loss that is known or expected. *Id.* at 79. A person " 'cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased.' " *Id.* (quoting *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 124 Wn.2d 789, 805, 881 P.2d 1020 (1994)). "Courts 'must determine whether a particular occurrence was expected by the insured before the insurance coverage was obtained.' " *Armed Citizens*, 28 Wn. App. 2d at 79 (quoting *Klickitat*, 124 Wn.2d at 805).

Washington courts have not discussed in detail the meaning of a risk-shifting and risk-distributing device. In *Armed Citizens*, the court stated that the agreement at issue involved risk shifting and risk distributing because members pooled their resources to provide benefits to other members. 28 Wn. App. 2d at 76. *Appleman* states,

> A contract of insurance is an agreement in which one party(the insurer), in exchange for consideration provided by the other party (the insured), assumes the other party's risk and *distributes it across a group of similarly situated persons*, each of whose risk has been assumed in a similar transaction.

NEW APPLEMAN at § 1.03[2] (emphasis added). *Washington Practice* states that "[r]isk-shifting means that one party shifts the risk of loss to another; risk-distributing means that the party assuming the risk distributes the potential liability to others." 35 D. DeWolf & M. Albrecht, WASHINGTON PRACTICE, WASHINGTON INSURANCE LAW AND LITIGATION § 1:3 at 3 (2025); *see also Beech Aircraft Corp. v. United States*, 797 F.2d 920, 922 (10th Cir. 1986)); *Amerco, Inc. v. Comm'r Internal Revenue Serv.*, 979 F.2d 162, 165 (9th Cir. 1992).

In *Armed Citizens*, this court analyzed whether an organization that provided financial assistance to members who incurred legal fees as a result of a self-defense incident was engaging in insurance. 28 Wn. App. 2d at 67. The organization's brochure stated that when a member used

force in self-defense, it would send up to $25,000 to the member's attorney and could provide up to $25,000 in bail assistance. *Id.* at 69.

The court concluded that the organization indemnified its members because it "undertook to provide funding to its members, whether by making payments directly to its members or to a third party." *Id*. at 78. The determinable contingencies in that case were the legal consequences of acts of self-defense, which were unknown at the time of contracting, and the legal expenses incurred, which would not be implicated if the need to defend against criminal and civil claims did not arise. *Id*. at 80-81. And the fund's membership agreement was a risk shifting and risk distributing device because member dues were deposited into a fund, which then was used to provide legal defense funding to members after a self-defense incident. *Id*. at 76. The organization's marketing materials stated that this meant that the members were pooling their resources to provide benefits to a member involved in a self-defense incident. *Id.* As a result, the court held that the organization was transacting insurance under RCW 48.01.040. *Id.* at 82.

3.   Analysis

There is no dispute that Jolley's membership agreement is a contract. Jolley argues the contract is not an insurance contract because it does not involve (a) indemnity or entitlement to payment, (b) determinable contingencies, or (c) risk shifting and risk distribution.

a.   Indemnification

Jolley argues that it does not indemnify members because providing services cannot constitute indemnity, the agreement was merely a contract to pay for services already rendered over time, and the agreement is nontransferable and does not involve a third-party. We disagree.

Indemnity involves protecting a person against loss, providing compensation to reimburse a person's loss, and providing a benefit to a person to offset their loss. *Armed*

13

*Citizens*, 28 Wn. App. 2d at 77.  Here, Jolley's club members incurred a loss – the cost of the dental services – when they received the services promised in the membership contract.  Because they were members, Jolley did not charge them for those services.  In other words, Jolley essentially paid for those services by absorbing the cost.  This fact is reflected in the account ledgers.  Jolley not charging its members was the equivalent of protecting, reimbursing, and providing a benefit to members to offset their loss.  Paying full price for the cost of dental services constituted a loss to the club members that was avoided through membership in the club.

Jolley argues that providing services cannot constitute indemnity.  We acknowledge that Jolley did not actually pay the members (or a third party) for the cost of the dental services rendered.  But indemnification does not need to take the form of a cash payment and can be made by providing valuable services.  *See  Knight's Estate*, 31 Wn.2d at 816.

Jolley argues that members are not indemnified because the membership is non-transferable and does not involve third party reimbursement.  But RCW 48.01.040 does not require a contract to be transferable or involve a third-party arrangement for it to be insurance.  And this court has said that a contract that undertook to provide funding to its members by paying them directly involved indemnity.  *Armed Citizens*, 28 Wn. App. 2d at 78 ("ACLDN's materials suggest that it undertook to provide funding to its members, whether by making payments directly to its members or to a third party.").

The cases to which Jolley cites for this contention are distinguishable.  Jolley cites *Kyrkos v. State Farm Mutual Automobile Insurance Co.*, 121 Wn.2d 669, 674-75, 852 P.2d 1078 (1993) for the proposition that insurance must involve a third-party payment arrangement.  The court in *Kyrkos* held that self-insurance for the purposes of the uninsured motorist statute was not insurance because it did not indemnify any specific person.  121 Wn.2d at 674-75.  But unlike

14

the self-insured drivers contemplated in *Kyrkos*, Jolley enters into a contract with its club members and promises to provide certain services in exchange for a monthly fee. Jolley also relies on *Washington Physicians Serv. v. Marquardt*, 67 Wn. App. 650, 838 P.2d 142 (1992). But that case involved an agreement to write group health insurance between two businesses, not an agreement between a health care provider and a patient. *Id.* at 653.

Accordingly, we hold Jolley's membership contract provided indemnity for membership club members.

### b. Determinable Contingency

Jolley argues that the membership contract does not involve any contingencies. We agree in part and disagree in part.

A loss is contingent (or fortuitous) if it occurs by chance and without intent. *Armed Citizens*, 28 Wn. App. 2d at 79. A loss is not contingent if a person subjectively knows or expects that a loss will occur at the time of contracting. *Id.*

Here, a person would register for membership and pay the $50 initiation fee with the expectation that they at least receive the first dental exam and cleaning. There would be no other reason to register. And if someone paid the initiation fee and did not schedule an appointment within 30 days, the fee was refunded. Therefore, we conclude that providing the first exam and cleaning did not involve a contingency.

Whether a second exam and cleaning (and multiple cleanings for periodontal members) will occur is less certain. Some members cancel after the first exam/cleaning. However, the people that remain members after the first exam/cleaning undoubtedly do so with the expectation that they will return for a second exam/cleaning. Therefore, we conclude that providing for a second exam and cleaning did not involve a contingency.

However, providing one emergency exam per year if needed and needed x-rays is different. No member would know or expect that they will have a dental emergency in any particular year. Such emergencies occur purely by chance. And it is uncertain whether x-rays would be needed. Therefore, we conclude that providing for an emergency exam and needed x-rays involved a contingency.

        c.    Risk-shifting and Risk-distribution

Jolley argues that the membership contract is not insurance because it is not a risk-shifting or risk-distributing device. We agree in part and disagree in part.

"Risk-shifting means that one party shifts the risk of loss to another; risk-distributing means that the party assuming the risk distributes the potential liability to others." 35 WASHINGTON PRACTICE § 1:3 at 3.

Here, no risk was involved for the first exam and cleaning. A person paid the initiation fee to obtain that first exam and cleaning, which was certain to occur. And the subsequent monthly dues helped pay for those services. Therefore, we conclude that providing for the first exam and cleaning did not involve risk shifting or risk distributing.

Whether a second exam and cleaning (and multiple cleanings for periodontal members) involved some risk is less certain. But there was no "risk" that a person would need a second exam and cleaning. Regular exams and cleanings are a normal part of dental health. The members simply were prepaying for inevitable exams and cleanings in the future. The membership contract was designed to provide necessary preventative dental services, not shifting or distributing risk. And there was no risk to Jolley if a member cancelled or did not schedule a second exam/cleaning.

Therefore, we conclude that providing for the second exam and cleaning did not involve risk shifting or risk distributing.

However, providing one emergency exam per year if needed and needed x-rays is different. Jolley clearly assumed the risk that a member would need an emergency exam and x-rays. And the dues paid by all the members were available to defray the ordinary cost of those services for a particular member. Therefore, we conclude that providing for an emergency exam and needed x-rays involved both risk shifting and risk distributing.

> d. Effect of "Partial" Insurance

We hold above that providing for two dental exams and cleanings per year does not constitute engaging in insurance, but providing for one emergency exam per year and needed x-rays does. The question is whether engaging in insurance in part is sufficient to affirm the OIC's cease and desist order.

We have three options: (1) affirm the cease and desist order because Jolley is engaging in insurance in part; (2) reverse the cease and desist order because the membership agreement primarily does not involve engaging in insurance; or (3) affirm in part and reverse in part, prohibiting Jolley only from providing for emergency exams.

The OIC argues for the first alternative. But there is no direct authority for how to handle a contact that only partly provides insurance. And the purpose of RCW 48.01.040 can be served by voiding the portion of a contract that constitutes insurance without voiding the entire contract.

Jolley argues for the second alternative. Jolley asserts that the principal purpose of the membership contract was to provide preventative dental services and to spread the cost of those services over a period of time. Jolley emphasizes that providing for the emergency exams was not a crucial part of the membership contract.

The problem with this argument is that when we interpret a contract, the goal is to determine the intent of the parties based on the contract language and not the parties "unexpressed subjective intent." *Parr v. Haselwood Imports, Inc.*, 15 Wn. App. 2d 604, 613, 476 P.3d 629 (2020). Nothing in the contract language indicates that members do not value the emergency exams or needed x-rays when deciding to enter the membership contract. Instead, the emergency exams and x-rays are promised to members in the contract in the same bullet-pointed list as the other treatments that Jolley says are central to the agreement.

In the absence of direct authority, we conclude that the third alternative is the best approach: affirm in part and reverse in part the reviewing officer's final order. This will require a remand for the OIC to modify the cease and desist order and reconsider the $20,000 fine, back taxes, and penalties (subject to a ruling on remand regarding the OIC's alternative argument that Jolley was operating as an unauthorized HCSC).

C.    OPERATING AS HCSC

The OIC argues that if we find that Jolley's membership club is not insurance, we should address its alternative argument that Jolley was operating as an unauthorized HCSC in violation of RCW 48.44.015(1). We decline to reach this issue.

RCW 48.44.015(1) states "A person may not in this state, by mail or otherwise, act as or hold himself or herself out to be a health care service contractor, as defined in RCW 48.44.010 without first being registered with the commissioner." An HCSC is defined as:

> any corporation, cooperative group, or association, which is sponsored by or otherwise intimately connected with a provider or group of providers, who or which not otherwise being engaged in the insurance business, accepts prepayment for health care services from or for the benefit of persons or groups of persons as consideration for providing such persons with any health care services.

RCW 48.44.010(9). The issue is whether Jolley operated as a HCSC as defined by the statute.

18

However, neither the ALJ nor the reviewing officer addressed this issue. "In the absence of an applicable record, we have nothing to review on appeal." *Madsen v. Dep't of Fish and Wildlife*, 33 Wn. App. 2d 371, 387, 561 P.3d 1216 (2025). "And we generally does not issue advisory opinions." *Id*. Accordingly, we decline to address whether Jolley unlawfully operated as an HSC in violation of RCW 48.44.015(1). The reviewing officer or ALJ can address the validity of the OIC's alternative argument on remand.

CONCLUSION

We affirm in part and reverse in part the reviewing officer's final order and remand for further proceedings. On remand, the reviewing officer or administrative law judge can consider the OIC's argument that Jolley was operating as an unauthorized HCSC. The OIC should modify the cease and desist order consistent with this opinion and with the ruling on its HCSC argument and reconsider the imposition of the $20,000 fine, back taxes, and penalties.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

GLASGOW, J.

CHE, J.